**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MONARCH NETWORKING SOLUTIONS LLC, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-00670-TSE-LRV |
| JUNIPER NETWORKS, INC., | |
| Defendant. | |

<u>**MONARCH'S OPPOSITION TO JUNIPER'S MOTION TO**</u>
<u>**TRANSFER VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA**</u>

## <u>TABLE OF CONTENTS</u>

I.    BACKGROUND ................................................................................................................ 2

    A.    Monarch's Patents.............................................................................................. 3

    B.    Juniper's Infringement ...................................................................................... 5

II.    LEGAL STANDARD....................................................................................................... 6

III.    ARGUMENT .................................................................................................................... 7

    A.    Monarch's choice of this District is entitled to substantial weight........................ 7

    B.    This District is more convenient for the parties.................................................... 14

    C.    This District is more convenient for party and third-party witnesses. ................. 18

        i.    This District is more convenient for party witnesses................................ 19

        ii.    This District is more convenient for third-party witnesses. ..................... 24

    D.    The interests of justice favor proceeding in this District. .................................... 27

IV.    CONCLUSION................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abstrax, Inc. v. Hewlett-Packard Co.*,
No. 14-cv-158-JRG, 2014 WL 5677834 (E.D. Tex. Nov. 4, 2014) ......................................16

*In re Apple Inc.*,
No. 041069C, 2019 WL 13095535 (Fed. Cir. Dec. 20, 2019)...............................................20

*Arabian v. Bowen*,
966 F.2d 1441 (4th Cir. 1992) .......................................................................................1, 30

*Asia Vital Components Co. v. Asetek Danmark A/S*,
No. 1:14-cv-1293, 2016 WL 9175601 (E.D. Va. Dec. 13, 2016)..........................................18

*In re Asus Comput. Int'l*,
573 F. App'x 928 (Fed. Cir. 2014) .......................................................................................19

*Bd. of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating & Air
Conditioning, Inc.*, 702 F. Supp. 1253 (E.D. Va. 1988) .................................................1, 7, 19

*Beam Laser Sys., Inc. v. Cox Commc'ns, Inc.*,
117 F. Supp. 2d 515 (E.D. Va. 2000) .............................................................................13, 14

*Certusview Techs., LLC v. S & N Locating Servs., LLC*,
No. 2:13-cv346-MSD, 2013 WL 6571833 (E.D. Va. Dec. 13, 2013) ..........................8, 14, 28

*In re Genentech, Inc.*,
566 F.3d 1338 (Fed. Cir. 2009)..............................................................................................16

*Gibbs v. Rees*,
No. 3:17-cv-386, 2018 WL 1460705 (E.D. Va. Mar. 23, 2018)..............................................6

*Glob. Touch Sols., LLC v. Toshiba Corp.*,
109 F. Supp. 3d 882 (E.D. Va. 2015) .....................................................................................8

*GraphOn Corp. v. Juniper Networks, Inc.*,
No. 2:07-cv-373, 2009 WL 10677815 (E.D. Tex. Sept. 29, 2009).........................................15

*Heinz Kettler GMBH & Co. v. Razor USA, LLC*,
750 F. Supp. 2d 660 (E.D. Va. 2010) ........................................................................6, 25, 26

*JTH Tax, Inc. v. Hines*,
No. 2:15-cv-558, 2016 WL 4582081 (E.D. Va. July 26, 2016)..............................................19

ii

*In re Juniper Networks, Inc.*,
    14 F.4th 1313 (Fed. Cir. 2021) ........................................................................23, 29

*In re Juniper Networks, Inc.*,
    No. 2021-156, 2021 WL 4519889 (Fed. Cir. Oct. 4, 2021)......................................23

*Koh v. Microtek Int'l, Inc.*,
    250 F. Supp. 2d 627 (E.D. Va. 2003) ..............................................................19, 20

*In re Kollar*,
    286 F.3d 1326 (Fed. Cir. 2002)................................................................................5

*Maglula, LTD. v. Amazon.com, Inc.*,
    No. 1:19-cv-1570, 2020 WL 9536937 (E.D. Va. Apr. 9, 2020)..........................6, 29

*Monarch Networking Sols. LLC v. Cisco Sys., Inc.*,
    No. 2:20-cv-00015-JRG, 2021 U.S. Dist. LEXIS 1551 (E.D. Tex. Jan. 5,
    2021) ..........................................................................................................25, 28, 30

*Monarch Networking Sols. LLC v. Cisco Sys., Inc.*,
    No. 2:20-cv-00015-JRG, 2021 WL 66551 (E.D. Tex. Jan. 7, 2021)........................4

*Monarch Networking Sols. LLC v. Cisco Sys., Inc.*,
    No. 2:20-cv-00015-JRG, No. 2:20-cv-00015-JRG (E.D. Tex. June 25, 2021) .......4

*Monarch Networking Sols. LLC v. Cisco Sys., Inc.*,
    No. 20-cv-00381 (W.D. Tex.)..................................................................................30

*MSP Recovery Claims, Series LLC v. Wesco Ins. Co.*,
    No. 20-cv-24048, 2021 WL 1043892 (S.D. Fla. Feb. 4, 2021) ..............................14

*Mullins v. Equifax Info. Servs., LLC*,
    No. 3:05-cv-888, 2006 WL 1214024 (E.D. Va. Apr. 28, 2006).......................27, 28

*Prod. Grp. Int'l, Inc. v. Goldman*,
    337 F. Supp. 2d 788 (E.D. Va. 2004) .......................................................................7

*Rheem Mfg. Co. v. Navien, Inc.*,
    No. 1:20-cv-1184-TSE, 2021 WL 4972621 (E.D. Va. Feb. 17, 2021)......................7

*Solas OLED Ltd. v. Apple Inc.*,
    No. 19-cv-00537, 2020 WL 3440956 (W.D. Tex. June 23, 2020) ...........................7

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
    581 U.S. 258 (2017)................................................................................................15

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
    No. 18-cv-12029, 2019 WL 1767394 (D. Mass. Apr. 22, 2019)..............................8

*Trs. of Columbia Univ. v. Symantec Corp.*,
No. 3:13-cv-808-JRR, 2014 U.S. Dist. LEXIS 46172 (E.D. Va. Apr. 1, 2014)...............13, 14

*Virginia Innovation Scis., Inc. v. Samsung Elecs. Co.*,
928 F. Supp. 2d 863 (E.D. Va. 2013) .....................................................................................14

*VS Techs., LLC v. Twitter, Inc.*,
No. 2:11-cv-43, 2011 WL 11074291 (E.D. Va. June 28, 2011)..............................................25

**Statutes**

28 U.S.C. § 1400............................................................................................................................8

28 U.S.C. § 1400(b)....................................................................................................................8, 15

28 U.S.C. § 1404(a) ..........................................................................................................1, 6, 7, 30

28 U.S.C. § 1412..............................................................................................................................6

Juniper's 28 U.S.C. § 1404(a) Motion ("Motion") to Transfer to the Northern District of California ("NDCA") should be denied because it relies largely on transfer decisions that apply other Circuits' law. In the Fourth Circuit, however, the moving "defendant bears a heavy burden of showing that the balance of interests weighs strongly in [its] favor in a motion to transfer." *Arabian v. Bowen*, 966 F.2d 1441 (4th Cir. 1992) (table); *see Bd. of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1259 n.20 (E.D. Va. 1988) (Ellis, J.) ("In a transfer motion, [the] movant bears a heavy burden of persuasion."). Juniper fails to meet its heavy burden here, as the balance of interests strongly favors proceeding in the Eastern District of Virginia ("EDVA")—Monarch's chosen forum.

*First*, Monarch's choice of forum should be given significant weight. Monarch could not have sued Juniper in Monarch's home district, the Central District of California ("CDCA"), where Juniper has no place of business. Monarch thus reasonably chose the the Eastern District of Virginia given Juniper's substantial physical operations in this District, the significance of this District to Juniper's bottom line, and the fact that Juniper performs (and induces others to perform) substantial acts of infringement here—both in its physical facilities and (directly and through inducement) in the physical facilities of its critical customers: Ashburn-based data centers, telecommunications providers, and the largest United States government contractors.

*Second*, this District is a convenient forum for both parties. Juniper has previously selected the Eastern District of Virginia as its preferred forum for a patent infringement suit against a non-resident defendant, demonstrating Juniper's comfort with litigating in this District. Juniper also has a substantial physical office less than 30 miles from the courthouse, which can host witnesses and documents at trial.

*Third*, this District is substantially more convenient for party and third-party witnesses. Monarch has identified 14 Juniper employees in or near this District who have specific knowledge of testing, setting up, configuring, and troubleshooting Juniper's products and the specific features that Monarch accuses of infringement: EVPN, VPLS, and MAP-E. And, unlike Juniper, Monarch outlines with specificity the testimony it intends to elicit from these individuals. As to third parties, Juniper's argument backfires, as the main organization it relies on for "third party" convenience—IETF—confirms that to the extent any historical, non-public records are required from it, those records are held and will be produced by the IETF Trust, which is a *Virginia* trust.

*Fourth*, the interests of justice weigh against transfer. This District has a local interest in this case being resolved here, given Juniper's extensive acts of local infringement. This District also brings patent cases to trial a year before NDCA. And Juniper's open admission of its use of "aggressive" litigation tactics against patent plaintiffs—designed solely to "drive up their costs"—raises legitimate concerns that such tactics underpin Juniper's desire to move to a slower district.

Juniper's motion to transfer should be denied.

## I.    BACKGROUND

In its "Factual Background" on pages 2-5, Juniper omits any description of Monarch's patents or the Juniper business activities that Monarch accuses of infringing those patents. Juniper's ommissions demonstrate why Monarch chose this District for filing suit: Monarch's patents read on core Juniper technology and the Eastern District of Virginia is a hotbed of Juniper's infringing activity. The Dulles technology corridor houses the largest concentration of data centers in the world.[1] It is the site of industry-leading, Juniper-reliant companies like Amazon Web

---

[1] Virginia Economic Development Partnership, Data Centers ("Virginia hosts the largest data center market in the world and is home to more than 35% (~150) of all known hyperscale data centers worldwide.").: https://www.vedp.org/industry/data-centers, *last visited* Jul. 12, 2023; *see id.* (describing "Northern Virginia – Data Center Alley").

Services, Cloudflare, Iron Mountain, and the largest U.S. government contractors.[2] And, despite Juniper's best attempts to downplay it, Juniper's Herndon office, and Juniper's decision to embed a raft of its "resident engineers" in the Virginia offices of its major clients, show how crucial the this District is to its business. This is why Monarch filed suit here: because Juniper specifically markets, sells, manages, performs, and induces acts of infringement that not only occur in this District, but are uniquely concentrated here, too.

### A.    Monarch's Patents

Monarch's four asserted patents—U.S. Patent Nos. 8,451,844 ("the '844 Patent"), 8,451,845 ("the '845 Patent"), 8,693,369 ("the '369 Patent"), and 8,130,775 ("the '775 Patent")— were invented and developed by engineers at France Telecom in Paris, a pioneer in network technology. Dkt. 1 (Compl.) ¶14. All provide key innovations solving current problems in modern packet-switched networks—and Juniper uses those solutions to help its EDVA-based customers.

Three out of the four patents address a foundational networking problem: how to migrate networks that rely on the older Internet Protocol version 4 (IPv4) to the more modern version 6 (IPv6). *Id.* ¶¶15-21 & 28-30. The need for IPv6 arose because the internet's founding architects never predicted how pervasive the internet would become. IPv4 addresses are typically formatted as 32-bits, which yields only four billion unique addresses. While four billion seemed like enough in the 1980s, the world quickly realized that these addresses would run out. With IPv6—and its 128-bit addresses—the number of unique IP addresses available for assignment and use grew exponentially. *See id.* ¶16. But moving from IPv4 to IPv6 is not as simple as flipping a switch, and

---

[2] *Compare Juniper Federal Partners*, https://www.juniper.net/us/en/partners/federal.html, last visited Jul. 26, 2023 (identifying as Juniper Authorized Partners: Lockheed Martin Corp., Raytheon Technologies Corp., and General Dynamics Corp.) *with Top-100 U.S. Government Contractors, Fiscal Year 2022 Report*, available at: http://www.fi-aeroweb.com/Top-100-US-Government-Contractors.html, last visited Jul. 26, 2023 (identifying Lockheed Martin, Raytheon, and General Dynamics as the top three prime contractors by dollars in 2022).

the solutions that network engineers devised to migrate to IPv6 were slow, processor-heavy, and resource-constraining. This resulted in resistance to, and a slow uptake of, IPv6. *See id.* ¶¶16-17. Even so, transitioning to IPv6 is unavoidable and critically important. As but one example, the U.S. Government has issued technical standards requiring IPv6's wide-scale adoption. *See* Ex. 1.[3]

Monarch's '844, '845, and '369 patents address this problem by providing improved techniques of migrating from IPv4 to IPv6 as well as optimizing networks that rely on both legacy IPv4 and newer IPv6 domains. *See* Compl. ¶¶15-21, 28-30. The '844 Patent reduces processing power and improves network speed through what is known as "stateless" translation between IPv4 domains and IPv6 domains (and vice versa). *Id.* ¶17. The '845 Patent discloses similar translation techniques as applied to "home gateways," which typically interconnect private networks to service provider networks. *Id.* ¶20. And the '369 Patent assists in the process of allocating addresses and port numbers for both IPv4 and IPv6 telecommunications networks. *Id.* ¶¶28-29.

The fourth patent, the '775 Patent, also reduces burdens and inefficiencies in networks by improving ways to implement "pseudo wires," which help facilitate the transmission of diverse and non-conforming packet types. *Id.* ¶¶23-24. In so doing, it reduces the need for multiple, redundant links, thus reducing the network resources consumed by such redundancy. *Id.* ¶24.

Monarch previously asserted the '844, '845, and '775 patents against Juniper's competitor, Cisco Systems, in the Eastern District of Texas. The court in that case issued a *Markman* order and construed over a dozen claim terms or phrases from the asserted patents. *See Monarch Networking Sols. LLC v. Cisco Sys., Inc.*, No. 2:20-CV-00015-JRG, 2021 WL 66551 (E.D. Tex. Jan. 7, 2021). In June 2021—less than two weeks before jury selection—Monarch and Cisco "agreed to settle … all claims" and stipulated to dismissal with prejudice. *Monarch Networking Sols. LLC v. Cisco*

---

[3] All exhibits (Nos. 1–80) are attached to the Declaration of Steven M. Seigel ("Seigel Decl.").

*Sys., Inc.*, Dkts. 348 & 349, No. 2:20-CV-00015-JRG, (E.D. Tex. June 25, 2021).

### B.      Juniper's Infringement

In briefly noting Monarch's infringement allegations on page 3, Juniper focuses entirely on the *products* (routers, switches, and associated accessories) and *features* (MAP-E, VPLS, and EVPN functionality run through the Junos OS) that Juniper makes for and sells to its customers. Certainly, Monarch accuses Juniper of infringement by making, selling, and offering to sell specific devices: for the '844, '845, and '369 Patents, Juniper products that implement "MAP-E" or "MAP-T" functionality, *id.* ¶¶37, 59, 101; and for the '775 Patent, Juniper products that implement "EVPN" and "VPLS" functionality, *id.* ¶78.[4]

However, Juniper's tangible products are only half the story. Juniper fails to mention that Monarch asserts both apparatus and *method* claims. There is a key "distinction between a claim to a product, device, or apparatus, all of which are tangible items, and a claim to a process, which consists of a series of acts or steps." *In re Kollar*, 286 F.3d 1326, 1332 (Fed. Cir. 2002). Monarch's patents include both. And Monarch specifically alleges that Juniper infringes its method claims whenever Juniper, alone or in combination with its customers, performs one or more infringing steps. For the '844, '845, and '369 Patents: by using or inducing its customers to use Juniper's products "as MAP Border Relays (BR) or MAP Customer Edges." Compl. ¶39, *see id.* ¶¶61, 106. For the '775 Patent: by implementing or inducing its customers to implement (i) "point-to-multipoint (P2MP) label-switched paths (LSP) … to a VPLS domain using pseudo-wires," *id.* ¶81; or (ii) EVPN to set up pseudo-wires between a series of routers, *id.* ¶¶89-91.

---

[4] Juniper argues that "MAP-T" is irrelevant because "that feature is still in development." Mot. at 3 n.1. Even if true, Juniper still infringes through such "development" by way of, for example, internal testing, prototyping, and configuring of its products with MAP-T functionality.

Juniper's blinkered focus on the Northern District of California as the place where its *products* were "designed and developed" (although Juniper declines to specify how much design and development occurred there) places undue emphasis on Monarch's apparatus claims. Monarch's method claims are equally important. And for those claims, Juniper's acts of infringement *in this District*, Comp. ¶¶3, 12, 49, 50, 72, 94, demonstrate why Monarch chose *this District* as its forum: because it is a concentrated core of infringing activity, a locus of evidence and witnesses (including from Juniper, its partners, and its customers), and a place of great economic value to Juniper. This case belongs in the Eastern District of Virginia.

## II.    LEGAL STANDARD

"In deciding whether to grant a motion to transfer under § 1404(a), a district court typically considers: (1) plaintiff's choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." *Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 667 (E.D. Va. 2010) (Ellis, J.). Juniper as "[t]he party seeking transfer bears the burden of proving 'that the circumstances of the case are *strongly* in favor of transfer.'" *Id.* (emphasis in original). "[W]here there is equipoise, the party bearing the burden of proof cannot prevail." *Maglula, LTD. v. Amazon.com, Inc.*, No. 1:19-cv-1570, 2020 WL 9536937, at *17 (E.D. Va. Apr. 9, 2020) (denying transfer, citation omitted).

"In ruling on a motion to transfer, a court may consider evidence outside the pleadings, but must draw all reasonable inferences and resolve factual conflicts in favor of the non-moving party." *Gibbs v. Rees*, No. 3:17-cv-386, 2018 WL 1460705, at *4 n.11 (E.D. Va. Mar. 23, 2018) (cleaned up) (applying the identically worded 28 U.S.C. § 1412 for bankruptcy cases). Should Juniper contest any of Monarch's facts, all disputes should be resolved in Monarch's favor. *Id.* This is especially so because Monarch sought, and Juniper refused, to engage in venue discovery. *See* Seigel Decl. ¶3 & Ex. 2. As such, the Court should resolve any doubts as to Juniper's facts

6

against Juniper, insofar as Juniper has refused to put them to the test. *See, e.g.*, *Solas OLED Ltd. v. Apple Inc.*, No. 19-cv-00537, 2020 WL 3440956, at *4 (W.D. Tex. June 23, 2020) (resolving factual disputes in favor of non-movant where "the plaintiff has yet to conduct discovery that could help resolve factual disputes" and "a plaintiff has no means to counteract [the defendant's factual] information beyond publicly available information while the defendant can rely on both confidential and public information").

## III.    ARGUMENT

Each of the four transfer factors weighs in favor of keeping this case in Monarch's chosen forum.[5] Monarch chose this District because of the extensive evidence of, and witnesses who can testify about, Juniper's infringing activity in this District. Juniper's claims to the contrary—and its insistence that some of its evidence and witnesses are in the NDCA—are flatly contradicted by Juniper's own litigation statements, declarant admissions, and conduct in other cases.

### A.    Monarch's choice of this District is entitled to substantial weight.

Although "a plaintiff's choice of its home forum is given more weight than its choice of a foreign forum," *Prod. Grp. Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 799 (E.D. Va. 2004), Monarch's considered choice of the Eastern District of Virginia should be given substantial weight here, given: (1) Monarch's inability to bring suit in its own "home," and (2) this District's "significant connection" to Juniper's infringing activities. *Id.*

Monarch agrees that Virginia is not its "home." Monarch is based in Irvine, an hour south of Los Angeles. *See* Compl. ¶5; Seigel Decl. ¶2. But what Juniper omits is that Monarch could not "choose" to sue Juniper in Monarch's home, the Central District of California, because Juniper

---

[5] Monarch does not dispute it might have brought suit in the Northern District of California. *Rheem Mfg. Co. v. Navien, Inc.*, No. 1:20-cv-1184-TSE, 2021 WL 4972621, at *1 (E.D. Va. Feb. 17, 2021); *see* Mot. at 7. The only question is whether Juniper has met its "heavy burden" to show that the § 1404(a) factors favor of transfer. *Sheet Metal Workers*, 702 F. Supp. at 1259 n.20.

does not reside there and has no "established place of business" there. *See* 28 U.S.C. § 1400 (patent venue). A plaintiff's choice of forum is entitled to more weight when that "choice of forum was restricted by 28 U.S.C. § 1400(b)," as Monarch's was here. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, No. 18-cv-12029, 2019 WL 1767394, at *5 (D. Mass. Apr. 22, 2019) (denying transfer). This case is the opposite of one where a "plaintiff *chooses* a forum other than its home." *Glob. Touch Sols., LLC v. Toshiba Corp.*, 109 F. Supp. 3d 882, 896 (E.D. Va. 2015) (emphasis added).

Monarch's choice of this District is also entitled to weight because of Juniper's extensive infringement in this District. Among the few venues Monarch *could* have selected based on Juniper's physical presence—E.D. Va., N.D. Ca., and D. Mass.—this District stands out. Juniper has a substantial and highly-concentrated customer base in this District, sets up testing, sales, and demonstration labs in this District, and embeds engineers to run and manage networks in this District. This fact—that Juniper *uses* Monarch's patented methods *in Virginia*—matters a great deal, because where the "alleged infringement involves the *use* of a method (and/or apparatus) within the Eastern District of Virginia," the patentee may "demonstrat[e] sufficient ties to this District to afford 'substantial weight' to its selection of forum." *Certusview Techs., LLC v. S & N Locating Servs., LLC*, No. 2:13-cv346-MSD, 2013 WL 6571833, at *4 (E.D. Va. Dec. 13, 2013).

Monarch alleges that Juniper performs acts or "step[s] of the accused methods … in this district." Compl. ¶12. And publicly available information confirms that such acts *in this District* are both highly concentrated and extensive, as numerous examples illustrate.

Juniper's Proof-of-Concept Test Lab (Herndon, VA): Proof of concept testing is a foundational part of Juniper's sales and services pipeline. "Before deploying a new product, technology, or network architecture *most of our customers go through a validation / proof-of-concept (POC) phase*." Ex. 3 at 2 (emphasis added). Juniper relies on its Herndon office to do just

that—including by testing the very products and features Monarch accuses of infringement.

As an example, Juniper advertises that it assisted major Virginia-data-center customer Iron Mountain—who has a 1,000,000 ft$^2$ data center in Manassas, VA, Ex. 4 at 1—to build its network. In a case study published on Juniper's website, Juniper boasts that it "helped [Iron Mountain] build a better network" using not only the accused MX and EX series routers and switches, but also by "conduct[ing] its proof-of-concept testing in Juniper's Northern Virginia lab." Ex. 5 at 1-2. Iron Mountain's own engineers confirm that Iron Mountain uses the accused EVPN and VPLS detailed in Monarch's Complaint. Ex. 6 at 1; *see also* Ex. 7 at 2 (Juniper VP of marketing stating in interview that Juniper's MX and EX products are "optimized for…VPLS").[6]

Juniper published another case study of its work with Washington, DC-based Dragos, Inc. to develop a network for electric utilities. Ex. 8 at 3, 15. At its Herndon, VA offices, Juniper built a "proof of concept" project that relied on not only the accused "MX Series" routers but specifically was "built on" the "Juniper Networks Ethernet VPN (EVPN)" "constituent technology." *Id.* at 5. Juniper even admits the evidence is at its offices in Virginia: "The project proof-of-concept is *maintained in Juniper's POC lab in Herndon, VA.*" *Id.* (emphasis added).

Juniper's Herndon, VA lab in this District contains other evidence of Juniper's testing. It is one of only four Juniper test labs worldwide. Ex. 3 at 3. Of the remaining three, one is in Westford, MA, and another in Amsterdam (both closer to this District), while only one is in NDCA. *Id*. Juniper admits that these labs contain extensive documentation about Juniper's testing. "Unit

---

[6] The Dulles technology corridor is also home to other leading data center providers and Juniper customers, including Amazon Web Services (AWS) and Cloudflare. *See* Ex. 9 at 2 (describing Cloudflare data centers in Ashburn); Ex. 10 at 13 (Cloudflare stating that "Juniper is…the biggest supplier of network equipment for Cloudflare"); Ex. 11 at 1 (third party report describing AWS as Juniper's "largest cloud customer"); Ex. 12 at 1 (AWS program guide describing its "US East" data center as located in "Northern Virginia").

test articles describe test cases based on a single device and a single service or feature," which Juniper occasionally "collect[s]" from its Herndon … POC lab[]." *Id.* And as described above on page 9, Juniper's Herndon POC lab will house testing documentation specific to at least the accused VPLS and EVPN functionalities. Juniper thus cannot dispute that it maintains and will be asked to produce highly relevant feature-testing documentation from its POC lab *in this District*.

Verizon-Virginia Contract (VA-wide): Juniper also helps Verizon infringe Monarch's patents. A large scale networking contract between the Commonwealth and Verizon expressly requires IPv6 compliance *and* use of the accused VPLS functionality on Juniper "router[s]/switche[s]," Ex. 13 (Contract Exhibit B) at 8, 54, including on the accused "MX960" routing platform, *id.* at 54, and the accused "EX series" and "QFX series" switches, *id.* at 166. The Contract states Verizon "is a Juniper J-Partner" and "has been working with … Juniper for over eight years as a vendor/partner in providing equipment for [Virginia's] Private IP MPLS network." *Id.* at 8. Juniper states that most service providers "such as Verizon," rely on the accused VPLS functionality, Ex. 14 at 1, and that "Juniper Networks is leading an industry-wide, multivendor initiative … [a]long with … Verizon" to "help[] define Ethernet VPN (EVPN)" Ex. 15 at 3; *see* Ex. 16. Industry participants confirm that Verizon uses all three accused VPLS, EVPN, and MAP-E functionalities, Ex. 17 at 1 (Verizon launches VPLS); Ex. 18 at 3 (Verizon "ease[s] the transition to IPv6" with "MAP-E"); Ex. 19 at 7 (identifying "Verizon" as one of the "authors" of EVPN "requirements and base specification"); Ex. 20 at 4 (Verizon offers VPLS). Verizon also maintains an expansive data center in Ashburn, VA. *See* Ex. 21 at 2.

IPv6 Certifications for the National Institute of Standards (Herndon, VA): Juniper also certifies compliance with IPv6 adoption out of its Herndon offices. The Office of Management and Budget directed the National Institute of Standards and Technology (NIST) to develop

technical standards "necessary to support wide scale adoption of IPv6 in the US Government." Ex. 1 at *i*. This standard is called "USGv6," and it requires "MAP-E," "VPLS," and "EVPN" capabilities. *Id.* at 20. Juniper certifies USGv6 compliance for federal procurement out of its Virginia offices. Juniper's Director of Certifications, Bill Shelton, signs "Supplier's Declaration[s] of Conformity" including for the accused QFX and EX series products, certifying that, in conformance with USGv6, the "host capabilities" of these products includes the accused MAP-E, VPLS, and EVPN functionalities. Ex. 22 at 7; Ex. 23 at 7. The form Mr. Shelton signed listed Juniper's Herndon address at "2251 Corporate Park Drive, Suite 100." Ex. 22 at 1. Mr. Shelton describes his role as "Product Manager for National Government Certifications." Ex. 24 at 1.

Juniper Authorized Partners in Northern Virginia: The Juniper Authorized Partners program is a revenue-essential sales and services extension with concentrated activity in Virginia. Juniper works hand in hand with its partners to offer sales, training, support, configuration, and installation of infringing products and functionalities. Ex. 25 at 17. As Juniper states in its most recent SEC 10-K, "The majority of our revenues are derived through value-added resellers and distributors." Ex. 26 at 29. Juniper's website lists ***eighteen*** Juniper Authorized Partners in this District, sixteen of which are in or near the Dulles Technology Corridor. *See* Seigel Decl. ¶3. By contrast, Juniper has less than half that amount—***seven*** partners—in NDCA. *Id.* ¶4. These Eastern District of Virginia "Partners" will be key sources of proof for infringing sales and services alike.

Technical Assistance Center, Training Center, and Sales Lab (Herndon, VA): Herndon is also home to one of only three Juniper training centers that "enable [customers] to learn how to fully deploy [their] Juniper Networks products;" Ex. 27 at 1, and one of only four "technical assistance centers" or JTACs that provide "24x7" customer support, "work[] with Development Engineering … to resolve [customer] issue[s]," provide "configuration" and "feature or

functionality" assistance, perform issue testing "in the JTAC lab," and supply "onsite technicians" to resolve particular problems. Ex. 28 at 4, 5, 10, 13. Herndon also houses a sales labs, at which Juniper personnel *actually configure* Juniper routers, switches, and servers to conduct customer demonstrations and troubleshoot customer network issues. Ex. 29 at 2. Juniper has publicly admitted that it "maintain[s] its "project proof-of-concept[s] … in Juniper's POC lab in Herndon, VA." Ex. 8 at 5. And given that Juniper's Herndon office is home to its JTAC and training center as well, it will naturally house documents, customer-support notes, training, and sales materials on deploying and troubleshooting the accused EVPN, VPLS, and MAP-E functionalities.

Virginia Based Customer Case Studies: Juniper advertises on its website eight white-paper "case studies" about Virginia-based customers and entities that rely on Juniper technology to resolve their networking issues. These case studies include Northern Virginia based companies CVEC, DNS Made Easy and Thundercat Technology, Virginia-wide healthcare provider Sentara Healthcare, fiberoptic provider Ting Internet, the City of Portsmouth, the College of William and Mary, and Roanoke Catholic Schools. *See* Seigel Decl. ¶5. Juniper also advertises case studies with large scale data-center operators Akamai, Rackspace, PacketFabric, Iron Mountain, and Equinix, all of whom operate data centers in the Eastern District of Virginia. *Id.* ¶6.

Hoping to bypass Monarch's allegations that Juniper infringes *in this District*, Juniper argues (incorrectly) on pages 8-9 that "Monarch contends Juniper committed acts of infringement in this District … only on the argument that Juniper has *sold and distributed* Accused Products in this District." Wrong twice over. Monarch expressly alleges that "Juniper commits acts of infringement *in this District* … [by] *performing at least one step of the accused methods* … at or from Juniper's regular and established place of business *in this District*," including by relying on "customer on-site employees *in this District* who conduct Juniper business, as well as home office

12

employees who conduct Juniper business *in this District*." Compl. ¶12 (emphases added). Monarch also alleges that Juniper induced infringement in this District by causing others to perform the methods. *See id.* ¶¶3, 12, 49, 50, 72, 94.

Also wrong is Juniper's claim on page 9 that the nationwide scope of Juniper's infringement defeats any special relationship to this District. As courts in this District have explained, "[t]he nationwide character of the alleged infringement does not diminish [the plaintiff's] choice of Virginia as its forum." *Beam Laser Sys., Inc. v. Cox Commc'ns, Inc.*, 117 F. Supp. 2d 515, 519 (E.D. Va. 2000). "[A]s long as the plaintiff brings its action in a forum where the alleged infringement is occurring, that choice should not be undermined by allegations that infringing activities occur throughout the country." *Id.*; *see Trs. of Columbia Univ. v. Symantec Corp.,* No. 3:13-cv-808-JRR, 2014 U.S. Dist. LEXIS 46172, at *18-*22 (E.D. Va. Apr. 1, 2014) (denying transfer even though products were "designed and produced primarily in … California" because plaintiff pleaded method claims were performed at Defendant's Virginia facility).

The Court should also view with skepticism Juniper's claim on page 1 that it "maintains [only] a small office in Herndon." As explained on pages 8 to 12, Juniper performs substantial infringing acts from that office by way of proof-of-concept testing, USGv6 certification, hands-on training, and customer support. And as described below on page 21, Juniper also employs "resident engineers" who are embedded in the Virginia offices of some of Juniper's largest customers to configure and manage networks that rely on and implement infringing functionalities. As the court in *Beam Laser* explained, even if a moving defendant's "operations, witnesses, and documents are centered in [another district], and [its] Virginia facilities are only local field operations," that "has no relevance to the issue of whether [plaintiff's] choice of forum in the Eastern District of Virginia is entitled to deference." 117 F. Supp. 2d at 519. Juniper's Herndon office is far more than just a

"local field operation." It is a concentrated hub of infringement.

Given (1) Monarch's inability to sue Juniper in Monarch's "home" district, and (2) Juniper's extensive acts of infringement in this District both at its Herndon office and by way of embedded engineers stationed in the Northern Virginia offices of Juniper's customers, Monarch "has demonstrated sufficient ties to this District to afford 'substantial weight' to its selection of forum for litigating the instant lawsuit." *Certusview*, 2013 WL 6571833, at *4; *see Beam Laser*, 117 F. Supp. 2d at 519; *Trs. of Columbia*, 2014 U.S. Dist. LEXIS 46172, at *18-*22.

**B.    This District is more convenient for the parties.**

Juniper gives short shrift to party convenience, addressing it in one paragraph on page 12. There is a reason for this brief treatment: this District is convenient for both parties.

For Monarch, Virginia is slightly more convenient. Monarch elected to litigate here and will take on any burden of bringing evidence here. All of Monarch's potentially relevant documents have already been collected and are stored in Monarch's Discovery vendor's "primary data center" in Virginia (with a backup in California). *See* Seigel Decl. ¶9; Declaration of Armando Hernandez ¶5 & Ex. A. Two of Monarch's officers reside in Southern California. Travel to either district requires a drive to Los Angeles and a nonstop flight. Seigel Decl. ¶7. One officer is in Austin, TX, for whom travel to either district is equidistant. *Id*. ¶8.

For Juniper, Virginia also is a convenient forum. Not long ago, Juniper itself selected this District to bring a patent-infringement suit against the California-based GraphOn Corporation. Compl. ¶13; *see* Ex. 30 ¶2 (alleging "GraphOn … [has a] principal place of business [in] … Santa Cruz, California"). Juniper's decision to "previously litigate[] a patent-infringement [case] in … this District" undercuts its claim that it is inconvenient to litigate a patent-infringement case here now. *Virginia Innovation Scis., Inc. v. Samsung Elecs. Co.*, 928 F. Supp. 2d 863, 871 (E.D. Va. 2013); *see MSP Recovery Claims, Series LLC v. Wesco Ins. Co.*, No. 20-cv-24048, 2021 WL

1043892, at *6 (S.D. Fla. Feb. 4, 2021) ("[T]he fact that Plaintiffs previously filed suit in [SDNY] demonstrates that Plaintiffs will not suffer any inconvenience or prejudice by transfer.").

A court in the EDTX came to the same conclusion in *GraphOn Corp. v. Juniper Networks, Inc.*, No. 2:07-cv-373, 2009 WL 10677815 (E.D. Tex. Sept. 29, 2009). There, the court presided over a parallel patent-infringement suit brought by GraphOn against Juniper in Texas. Juniper moved to transfer the case to the Northern District of California. The court denied transfer because it found Jupiter's position disingenuous. Although Juniper *claimed* that the NDCA was "more convenient" and had "a local interest in the resolution of the dispute," the court viewed that claim "with some caution" given Juniper's choice to file its own "patent infringement case against GraphOn … in the Eastern District of Virginia." *Id.* at *1, *4. "[B]y filing suit in the Eastern District of Virginia, Juniper has demonstrated that it is not inconvenient to litigate the dispute across the country, away from its party witnesses and its sources of its proof." *Id.* at *4.

Juniper has also repeatedly sued foreign defendants in foreign forums when it proceeds as a plaintiff. In *Juniper Networks, Inc. v. Toshiba Am., Inc.*, Juniper sued New Jersey-based Toshiba America in the Eastern District of Texas for patent infringement. Ex. 31 ¶2. In *Juniper Networks, Inc. v. Bhattab*, Juniper sought a declaratory judgment of non-infringement against a Saudi resident in Washington, DC. Ex. 32 ¶2. And in *Juniper Networks, Inc. v. Palo Alto Networks, Inc.*, Juniper sued California-headquartered Palo Alto Networks for patent infringement in Delaware. Ex. 33 ¶7. Juniper is thus content to bring suit away from both the Northern Distric of California *and* its target's home venue when doing so suits its own needs.[7]

---

[7] Juniper filed all of these cases *before* the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 267 (2017) (limiting proper venue in patent-infringement actions under 28 U.S.C. § 1400(b) to the accused infringer's state of incorporation or the forum where the accused infringer has a "regular and established place of business"). In the pre-*TC Heartland* world, Juniper as patentee possessed a far broader range of potential forums—namely,

To be sure, Juniper's choice of this District as a forum for filing a patent infringement suit should not "significantly" weigh against transfer. *In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009) (applying Fifth Circuit law in holding that court erred in finding that Genentec's "previous appearance as a plaintiff in the [EDTX] counted significantly against transfer"). But Juniper's pattern of suing non-resident defendants in non-NDCA districts shows that: (1) Juniper is happy to litigate in foreign districts generally, and this District specifically, and (2) Juniper's claim that this District would be "inconvenient" for it as a party should not be taken as legitimate.

Juniper also claims that the NDCA will be more convenient than this District because "many technical documents and most of the source code" are in Sunnyvale, CA. Mot. at 12. Setting aside that "most" and "many" are "weasel words" whose "meaning is malleable to a point where they mean what the user wants them to mean," *Abstrax, Inc. v. Hewlett-Packard Co.*, No. 14-cv-158-JRG, 2014 WL 5677834, at *2 (E.D. Tex. Nov. 4, 2014) (disregarding claim that a "substantial portion" of documents are in foreign forum), Juniper is not very trustworthy on this point.

As to "source code," Juniper's litigation conduct in other cases shows that it rarely, if ever, produces its code for inspection "at Juniper's Sunnyvale headquarters." Mot. at 12. Rather, Juniper has agreed to or has in fact produced its source code for inspection at: (1) a third-party escrow in Washington, DC, *see* Ex. 34 at 7; (2) a third-party escrow in Dallas or Houston, Ex. 35 ¶11(b); (3) a third-party escrow with no pre-identified location, Ex. 36 ¶11(b); (4) its outside counsel's offices in Newport Beach, CA, *see* Ex. 37 at 1; and (5) its outside counsel's office with no pre-identified location, *see* Ex. 38 ¶11(a). As Juniper readily admits, producing its code in this manner still "allow[s] Juniper to monitor the security of its source code throughout the review process and

---

any district court where personal jurisdiction over the infringer was proper—meaning Juniper could amply consider its own convenience when choosing where to file suit.

provide timely and effective technical support." Ex. 39 at 6 n.1. Juniper has also admitted in a sworn declaration that it "make[s] it source code available for review by various military and security divisions within the United States government and its allies," making clear that Juniper can securely produce its code outside Sunnyvale if there is a commercial reason to do so. Ex. 40 ¶5. As it has done in past cases, Juniper can also produce code in this case at an escrow or at its counsel-of-record's offices in Washington, DC; Los Angeles, CA; or Redwood Shores, CA.[8]

As to "technical documents" that Juniper claims to store in the NDCA, Juniper never defines the term "technical documents." As noted above with respect to Juniper's Herndon office, Juniper certainly conducts training, technical assistance, and proof-of-concept testing in this District. Whether documentation of such activity is considered "technical" or not, Monarch will certainly seek such evidence *from Juniper's Virginia facility*. Juniper itself admits that an infringing "project proof-of-concept is *maintained in Juniper's POC lab in Herndon, VA*." Ex. 8 at 5. Monarch will also seek "technical documents" from third parties *in this District*, such as Juniper Partners and Juniper customers, including Northern Virginia-based data centers.

Other publicly available information suggests that Juniper's "weasel words" are doing the heavy lifting. As one example, Juniper uses Oracle Cloud infrastructure for both supply chain planning (SCP), Ex. 41, and enterprise sales (Configre, Price, Quote, or "CPQ"), Ex. 42. Oracle Cloud is hosted in four regions in the United States (*i.e.*, geographic locations where Oracle houses data centers), one of which, US East, is in Ashburn, Virginia. Ex. 43.[9] Juniper never mentions

---

[8] Tellingly, neither Juniper nor its declarant ever states that Juniper is unable to access its source code or technical documents from Juniper's Herndon office, nor do they state that Juniper's Herndon office is insufficiently secure to serve as a location for code review. Indeed, Juniper readily admits that credentialed Juniper employees such as software developers can access Juniper source code from "its internal network" *via* an authentication process. Ex. 34 at 4.

[9] Oracle's Ashburn-based region include ***three times*** as many "availability domains" as Oracle's San Jose, CA-based region. *See* Ex. 44 at 5. Oracle explains that "A region is a localized

these Virginia data centers, nor does it disclose which of its documents are stored there. Juniper also recruits on the promise of remote work, advertising that employees can work "anywhere [they] can get an Internet connection—airports, coffee shops, fast food restaurants, service stations, partner locations, hotels, conferences, grocery stores, even at [their] son's drum lessons." Ex. 45 at pdf p. 3. Juniper is thus *very careful* never to argue that it cannot access and download all potentially relevant documents from Virginia, because Juniper knows that is just not true.

Juniper's Herndon office—which is less than 30 miles from the Alexandria courthouse—can also "serve as [a] useful location[] to host witnesses who may need to travel to [Virginia] for an extended period of time," in addition to "serv[ing] as convenient depositories" of documents used at trial. *Asia Vital Components Co. v. Asetek Danmark A/S*, No. 1:14-cv-1293, 2016 WL 9175601, at *2 (E.D. Va. Dec. 13, 2016). Unlike Juniper, Monarch has no physical offices in either this District or the NDCA; both are of equal convenience to Monarch from this perspective.

In sum, the party-convenience factor weighs in favor of retaining this case in this District. Juniper has previously found this District to be a convenient forum. Juniper maintains documents and evidence of acts of infringement in this District. And because Juniper is content to produce its code at locations far from the NDCA, it should be equally content to do so here.

### C.    This District is more convenient for party and third-party witnesses.

This District is substantially more convenient for party and third-party witnesses. In contrast to Juniper's superficial and vague identification of six NDCA-based party witnesses with "some" potentially relevant knowledge, Mot. at 3-4, Monarch identifies and summarizes the expected testimony of: 14 Juniper EDVA-based employees with knowledge of Juniper's

---

geographic area, and an availability domain is one or more data centers located within a region." *Id.* at 1. Oracle's US East region (in Ashburn, VA) has three availability domains, in comparison to Oracle's US West region (in San Jose, CA), which has only one availability domain. *Id.* at 5.

infringement in this Distrixt; 4 Juniper non-EDVA-based employees for whom this District is more convenient; and a series of third parties for whom this District is a more convenient forum.

> ### i.    This District is more convenient for party witnesses.

As an initial matter, the Court should give no weight to Juniper's assertion that the NDCA is more convenient for the six NDCA-based witnesses it identified. *See* Mot. at 3-4. Juniper provides no description of any testimony it expects from these witnesses, thus failing to carry its burden. "To assist a court in analyzing [the witness-convenience] factor and assessing the importance and availability of specific witnesses, any party claiming that witness inconvenience necessitates a venue change should supply a court with reliable information, identifying the witnesses he intends to call, along with information about their expected testimony." *JTH Tax, Inc. v. Hines*, No. 2:15-cv-558, 2016 WL 4582081, at *6 (E.D. Va. July 26, 2016). The movant must give "particularized information" that "specifically describe[es] their testimony." *Sheet Metal Workers*, 702 F. Supp. at 1258. Without such particularity, the moving party cannot meet its burden. *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 636 (E.D. Va. 2003); *see In re Asus Comput. Int'l*, 573 F. App'x 928, 929 (Fed. Cir. 2014) ("ASUS offered nothing more than speculation that the three witnesses it identified that reside in [NDCA] will be required at trial.").[10]

Juniper's description of its witnesses is entirely contained on pages 3-4 of the Martinez Declaration, which comprises a list of names, titles, and a *de minimis* summary of generalized "knowledge." For example: "Alex Baban (Distinguished Engineer) has technical and development knowledge relating to the accused 'MAP-E' feature," or "Vasily Mukhin (Product Manager) has technical and development knowledge relating to the accused 'VPLS' and 'EVPN' features." Dkt. 35-3 (Martinez Decl.) ¶7. Juniper identifies none as likely witnesses, gives no summary of the

---

[10] Particularly given Juniper's refusal of venue discovery, *see* Ex. 2, this Court should look askance at any effort by Juniper to sandbag Monarch by correcting these deficiencies on reply.

testimony Juniper expects to elicit, and never states that their knowledge is unique or non-cumulative of other witnesses located elsewhere. The declaration, and Juniper's reliance on it, markedly fails to satisfy Juniper's burden. *Koh*, 250 F. Supp. 2d at 636. The Court would enjoy "considerable discretion" if, after evaluating Mr. Martinez's meager statements of "knowledge," it gave them no weight at all. *In re Apple Inc.*, No. 041069C, 2019 WL 13095535, at *2 (Fed. Cir. Dec. 20, 2019).

Even ignorning Juniper's burden, Monarch conducted its own open-source research on the technical employees Juniper identified (Baban, Patrick, Denny, Gupta, and Mukhin) and in doing so uncovered no information linking these indivduals with the accused Juniper functionalities: no scholarship, no patents, no blog posts, no LinkedIn profiles, and no IETF documents.

Juniper's identification of 6 employee witnesses stands in stark contrast with the 14 that Monarch identifies below who openly advertise their expertise in the accused EVPN, VPLS, and MAP-E functionalities, and who are located in or very near to this District. Monarch also provides in the table below the expected testimony of each, which relates directly to Juniper's infringement in Virginia. For each witnesses, this District is more convenient than the NDCA.

| Expected testimony of Juniper employee-witnesses in or near the E.D. Va.: |
|---|
| **Bill Shelton**, *Director of Certifications (Herndon, VA)*: compliance certification and testing of accused products—including Juniper QFX series products—for compliance with USGv6 functionality requirements, including MAP-E, VPLS, and EVPN functionalities. Ex. 24 at 1. |
| **Ron Bonica**, *Distinguished Engineer (Reston, VA)*: knowledge of, Juniper contributions to, and Juniper implementations of (1) EVPN functionality, Ex. 46; (2) MAP-E and MAP-T functionality, including as described in IETF "Requirements for IPv6 Customer Edge Routers |

| |
|---|
| to Support IPv4-as-a-Service," Ex. 47 at 1, 8,  and (3) "Ethernet Virtual Private Network (EVPN) connectivity among … data centers." Ex. 48 at 2. |
| ***Majid Ansari***, *Distinguished Systems Engineer (Herndon VA)*: delivery of technical training, marketing, and instructional material relating to the accused EVPN functionality, including a 40-minute video, *Serious Discussion about Data Center Management in the Cloud*, and a 30-minute video, *Apstra: the Value is Integration*, hosted on Juniper's YouTube Channel, which are focused on deploying EVPN functionality. *See* https://youtu.be/mFToDD2ozho?t=62 and https://youtu.be/47RKjLhP7qk?t=76; *see also* Ex. 49 at 1. |
| ***Yasmin Lara***, *Technical Marketing Engineer (DC)*: proof-of-concept "test" design, customer training, and sales including for the accused "MX" and "QFX" series routers and switches and "VPLS" functionality implementation. Ex. 50 at 1-2. |
| ***Anurag Menon***, *Systems Engineer (Herndon, VA)*: "helping a range of business customers build their internal network" including "EVPN" features. Ex. 51 at 1. |
| ***Mathoor Iqbal***, *Senior Sales Engineer (Ashburn, VA)*: Juniper's "data center infrastructure" and "architecture" including "IPv4, IPv6," "VPLS" and "EVPN." Ex. 52 at 1-2. |
| ***Mike Moody***, *Senior Network Engineer (Waldorf, MD)*: "switching infrastructure includ[ing] Juniper EX4200 switches," as well as "Extensive … scenarios includ[ing] VPLS and p2p pseudo-wire schemes." Ex 53 at 1. |
| ***Lei Zhang***, *Technical Support Engineer (VA)*: use of Juniper's Virginia "JTAC local test environment," support for "Data Center," "Enterprise Routing" and "Service Provider Core/Edge" networks, including accused "EX" and "QFX" Juniper products. Ex. 54 at 1-2. |

| |
|---|
| ***Mat Nguyen***, *Resident Engineer / Verizon Embedded (Ashburn, VA)*: Juniper on-site customer support for one of Juniper's largest customers, Verizon, including "supporting over 1000 core, border, and edge routers." Ex. 55 at 1. |
| ***Niranjan TS***, *Customer Success Expert (Herndon, VA)*: "Designing and building Test Topologies using Network products" and "simulating complex test scenarios" in light of specialization in "VPLS" including on the accused "MX series" products Ex. 56 at 1. |
| ***Amar Vodnala***, *Software Engineer (Aldie, VA)*: "design, implementation and troubleshooting of large scale Enterprise and Service Provider" networks and specialization in VXLAN implementation, Ex. 57 at 1, which includes EVPN environments, Ex. 58 at 2. |
| ***Peter Fernandez***, *Customer Technical Support Engineer (Centreville, VA)*: "Design and Certification Testing of IPv6 for public domain … and private domain" with JNCIE Service Provider certification, Ex. 59 at 1, which includes expertise in VPLS and EVPN, Ex. 60 at 3. |
| ***Jorge Edgar Pena Garcia***, *Technical Support Engineer (Herndon, VA)*: customer technical support and training in "CORE/EDGE" and "Carrier Ethernet Deployments" with JNCIE Service Provider certification, Ex. 61 at 1, with expertise in VPLS and EVPN, Ex. 60 at 3. |
| ***Vijay Kestur***, *Software Engineer (Raleigh NC)*: expert in and has filed patent application on methods of "routing pseudo-wire encapsulated packets." Ex. 62 at 1. |

Monarch also agrees with Juniper's identification of **Wen Lin** (Westover, Massachussets) and **Ashish Ghule** (Bengaluru, India) as Juniper witnesses with likely relevant knowledge who reside outside California. *See* Martinez Decl. ¶¶8-9. Publicly available information confirms both are knowledgeable of the accused features. Ms. Lin authored three IETF "requests for comment" and over twenty IETF "internet drafts" on the accused EVPN functionality. *See* Ex. 63. Mr. Ghule confirms his knowledge of "stateless handling of IPV4-fragments-in-IPV6" and "operational

capabilities of border relay device." Ex. 64. This District is closer for Ms. Lin (a 90 minute flight versus a 6.5-hour flight), and roughly equivalent for Mr. Ghule. *See* Seigel Decl. ¶¶10-11.

Monarch also identifies two additional Juniper witnesses who have relevant knowledge and for whom this District is more convenient than NDCA. *See* Seigel Decl. ¶¶12-13.

| Expected testimony of Juniper employee-witnesses outside of the E.D. Va.: |
|---|
| **Kishore Tiruveedhula**, *Software Engineer Senior Staff (Nashua, New Hampshire)*: Juniper's development and implementation of the accused EVPN as described in five IETF "internet drafts" on EVPN functionality and the Juniper Manuscript, DAY ONE: SEAMLESS EVPN-VXLAN TUNNEL STITCHING FOR DC AND DCI NETWORK OVERLAY. *See* Ex. 65, Ex. 66. |
| **Krzystof Grzegorz Szarkowicz**, *Technical Marketing Engineer (Hungary)*: delivery of technical training, marketing, and instructional material relating to the accused EVPN-VPWS functionality, including through creation of "pseudo wires" as described in the Complaint. *See* https://youtu.be/O5IG6hdXsNA; *see also* Ex. 67 at 1. |

Juniper leans heavily on two Federal Circuit cases directing transfer from Texas to NDCA—*In re Juniper Networks, Inc.*, 14 F.4th 1313, 1318-19 (Fed. Cir. 2021) ("*Juniper I*"); and *In re Juniper Networks, Inc.*, No. 2021-156, 2021 WL 4519889, at *2 (Fed. Cir. Oct. 4, 2021) ("*Juniper II*")—to argue that both cases present "similar facts" regarding party-witness convenience and that "the same result should follow" here. Mot at 11. The facts are not similar at all. In *Juniper I*, "Juniper identified eleven potential party witnesses who were located in [NDCA], while [plaintiff] Brazos identified only one party witness in [WDTX]." 14 F.4th at 1319. And even that lone Texas witness "was not alleged to have information relating to the merits of the infringement claims." *Id.* In *Juniper II*, "Juniper identified 10 out of 12 potential employee witnesses and two inventors living or working in [NDCA]. [Plaintiff] Correct Transmission, on

the other hand, identified no willing witnesses in [WDTX]." 2021 WL 4519889, at *2. In both cases, there were *no* relevant witnesses based in the originating district, in comparison to ten or eleven relevant witnesses in the NDCA. Here, in contrast, Monarch has identified over 14 Juniper witnesses in or near this District who have *more* relevant knowledge than the ones Juniper identified (and another 4 for whom this District is closer than the NDCA) in comparison to Juniper's 6 in the NDCA. More importantly, Monarch offers details of the likely testimony of its identified witnesses, while Juniper provides no detail at all.

***ii.        This District is more convenient for third-party witnesses.***

Juniper purports to identify three categories of third-party "witnesses" that it claims are relevant and will find the NDCA more convenient: (1) IETF, (2) Acacia Research, and (3) prior-art witnesses **Ting Zou** and **Rahul Agrawal**. Mot. at 5-6, 11. Juniper is wrong as to all three.

IETF: The IETF is a standards body whose only potential role in this case is to provide documents that are already available on its website. The authors of RFC 7597, which Monarch describes in its Complaint, are located all over the world. Ex. 68 at 32-34. Juniper names none of them as likely witnesses. Juniper also does not identify any IETF personnel—and rightly so. As Juniper's own "IETF Legal Request" exhibit makes clear, "It is almost never the case that information sought from IETF will need to be obtained via oral deposition." Mot., Ex. D; *see* Ex. 69. IETF "has very few full-time employees," and "[d]efending a deposition places an undue strain on [its] limited resources," which is why it uniformly opposes depositions. *Id.* As for IETF documents, the "IETF Legal Request" page *also* says that almost all IETF documents are publicly available online, but that certain historical records are held by IETF Trust. *Id.* at 2. Juniper omits to tell the Court that the IETF Trust is a "trust … established under the laws of *Virginia, USA*." Ex. 70; *see* Ex. 71 at 2 (2d Am. Trust Ag). At best, all of Juniper's document needs will be satisfied

24

by online documents; at worst, Juniper will require help from a *Virginia* trust, for whom this District is a more convenient forum. If anything, IETF's role in this case weighs against transfer.

Acacia: Acacia is Monarch's parent and has limited relevance to the core issues of infringement, invalidity, or damages in this case. Likely for that reason, Juniper does not identify any specific Acacia witnesses from whom it will elicit testimony, nor does it specify the subject matter of any testimony, thus failing its burden to demonstrate that any Acacia witnesses are needed at trial and thus will be inconvenienced by travel to this District. As another court held when rejecting a nearly identical argument made by Cisco—in an earlier case Monarch brought against Cisco in the Eastern District of Texas—"Live testimony from multiple witnesses from a plaintiff's corporate parent are not likely to play a significant role at trial," if at all. *Monarch Networking Sols. LLC v. Cisco Sys., Inc.*, No. 2:20-cv-00015-JRG, 2021 U.S. Dist. LEXIS 1551, at *28 (E.D. Tex. Jan. 5, 2021); *see id.* at *18 ("[T]he odds that evidence from Monarch's corporate parent will play a major role at trial are slim."). Regardless, all unidentified Acacia witnesses should be counted as willing witnesses who will travel to this District voluntarily, eliminating any need for compulsory process to secure attendance. Decl. of Marc Booth ¶6. Acacia is neutral regarding third-party convenience.

Prior-Art Witnesses: Juniper names two NDCA-based individuals that it claims are "likely to have relevant information regarding prior art to the Asserted Patents." Mot. at 6. Juniper does not state what testimony, if any, Ms. Zou and Mr. Agrawal will likely offer, and it does not say that either are unwilling witnesses. Such arguments "regarding potential non-party witnesses is speculative" and should be given no weight. *VS Techs., LLC v. Twitter, Inc.*, No. 2:11-cv-43, 2011 WL 11074291, at *8 (E.D. Va. June 28, 2011); *see Heinz Kettler*, 750 F. Supp. at 669 (disregarding claim of third-party inconvenience where movant "failed to show that compulsory process is

needed to obtain their testimony"). At most, Juniper claims that one of the witnesses (Mr. Agrawal, a former Juniper employee) was the inventor of a reference used in an *Inter Partes* Reviews (IPR) filed against Monarch's patents. Mot. at 6. But if that is the yardstick, then Juniper fails to mention the *other* references asserted in those IPRs, whose inventors are from Michigan (2), Netherlands (2), France (3), Singapore (3), California (2), and Washington (1). *See* Seigel Decl. ¶14(a)-(f). The first seven are closer to this District, while the remaining six are closer to the NDCA.

Juniper also conspicuously omits reference to the following third parties:

Original and Former Assignees: Juniper never mentions either Orange S.A., formerly France Telecom and the original assignees of the asserted patents, or Transpacific IP, former assignees of the asserted patents. Orange is a French company, and any evidence it possesses is likely located in France. *See* Ex. 72. Transpacific is a Singaporean company, and its evidence is likely in Singapore. *See* Ex. 73. The Northern District of California is convenient for neither.

Former Juniper Employees: Monarch also identifies (and summarizes the expected testimony of) three third-party witnesses who either reside in or are far closer to this District than the NDCA. These witnesses are former Juniper employees outside the subpoena power of the NDCA. Monarch cannot obtain their testimony should they decline to do so voluntarily. *Cf. Heinz Kettler*, 750 F. Supp. 2d at 669 (witness "closely identified" with party may be presumed willing).

| Expected testimony of third-party witnesses: |
|---|
| **Russ White (Tennessee)**: while at Juniper (his former employer), Mr. White co-authored an IETF draft, *Expanding the IPv6 Lab Use Space*, which details the accused MAP-E functionality. Ex. 74 at 1, 7. Monarch intends to elicit testimony on Juniper's development of MAP-E. Mr. White's home in Louisville, TN is closer to this District than NDCA. Ex. 75 at 1. |

> **Derik Dong (DC)**: while at Juniper (his former employer), Mr. Dong states that he served as a test engineer, and lists his expertise as including the accused EVPN functionality. Ex. 76 at 1. Mr. Dong is also a certified JNCIE-SP, which includes expertise in VPLS and EVPN. Ex. 60 at 3. Monarch intends to elicit testimony from Mr. Dong on Juniper's test environments and performance of infringing methods using EVPN functionality. He is based in DC. Ex. 76 at 1.

> **David Whithed (Gainesville, VA)**: while at Juniper (his former employer), Mr. Withed served as a resident engineer who worked directly with the accused "MX series routers, EX and QFX series switches," and worked with "customer[s] on migration from VPLS to EVPN," both of which are accused functionalities. Ex. 77 at 1-2. Monarch intends to elicit testimony about Juniper's direct infringement using the accused functionalities as well as its inducement of customers to perform the infringing methods.

*   *   *

The party-witness factor strongly weighs against transfer, given (1) the presence of at least 14 Juniper witnesses with highly relevant knowledge based in or near this District, and (2) Juniper's failure to provide *any* particularized information about the NDCA-based witnesses it identified. The third-party witness factor also weighs against transfer, given that (1) IETF, to the extent it has any role at all, will involve the participation of a Virginia trust, (2) Acacia's witnesses will testify willingly at trial, (3) Juniper fails to identify with specificity any required testimony from prior art witnesses in California, and (4) Monarch has identified at least 3 former Juniper employees (now third parties) in or near this District whose testimony is relevant to this case.

### D.   The interests of justice favor proceeding in this District.

The final factor—which encompasses "public interest factors aimed at systemic integrity and fairness"—favors maintaining Monarch's case in this District. *Mullins v. Equifax Info. Servs.,*

27

*LLC*, No. 3:05-cv-888, 2006 WL 1214024, at *8 (E.D. Va. Apr. 28, 2006). <u>Systemic integrity</u> includes (i) "judicial economy and the avoidance of inconsistent judgments" and (ii) "a party's attempt to game the federal courts through forum manipulation." *Id.* <u>Fairness</u> includes (iii) "docket congestion," (iv) "interest in having local controversies decided at home," (v) "knowledge of applicable law," (vi) "unfairness in burdening forum citizens with jury duty," and (vii) "interest in avoiding unnecessary conflicts of law." *Id.* Juniper does not invoke subfactors (i), (v), (vi), or (vii), and Monarch agrees that these subfactors are either neutral or irrelevant here.

Juniper's only affirmative argument for transfer is that factor (iv) "local interests" leans towards the NDCA because "the Accused Products and Features were designed and developed, and are maintained, by engineers" in the NDCA. Mot. at 13. This ignores what Juniper admitted on page 3 of its Motion—that its products and features are not exclusively designed in the NDCA, but rather include contributions from personnel in "China and/or India" as well. (Juniper declines to say how *much* "design" or "development" work is done at any location for each feature.)

Even if *all* of the design and development work occurred in the NDCA, Monarch's case is focused not just on *apparatus* claims, but also on *method* claims, and Monarch alleges that Juniper itself performs (and induces others to perform) Monarch's methods *in this District*, Compl. ¶12, and substantially so. Juniper's argument also overlooks the extensive factual evidence of its infringement *in this District*, the significance of Juniper's customers *in this District*, and the fact that *this District* is a uniquely concentrated hub of infringing activity. This fact—that Juniper is "engaging in large-scale infringement in *Virginia*"—means that Virginia *also* has a "local interest" in this case, as much if not more than the NDCA. *Certusview*, 2013 WL 6571833, at *6.

Juniper next tries to downplay the significance of factor (iii) "docket congestion"—likely because it cannot dispute that the average time to jury trial in patent cases is 36.6 months in the

NDCA, Ex. 78 at 3, but only 26.5 months in this District, Ex. 79 at 3. "A faster average time to trial means a more efficient and economical resolutions of the claims at issue." *Monarch v. Cisco*, 2021 U.S. Dist. LEXIS 1551, at \*35. This District also resolves cases without trial more quickly than in the NDCA: a median of 9.4 months (and an average of 12.7 months) for "mature termination" in this District, compared to a median of 19.3 months (and an average of 23.7 months) in NDCA. *Compare* Ex. 79 at 3 (EDVA), *with* Ex. 78 at 3 (NDCA). Citing *Juniper I*, 14 F.4th at 1313, Juniper argues that because Monarch makes no products, time to trial "is of no particular significance" to Monarch. Mot. 14. That is a misreading of *Juniper I*, which held only that a speedier time to trial for a non-practicing patentee should not be given "*important* weight"—it did not say it should be given no weight at all. *Id.* at 1322 (emphasis added). Rather, this District's swift resolution of cases should be given weight as long as there are "non-negligible contacts in Virginia to support litigation in this venue," as there are here. *Maglula*, 2020 WL 9536937, at \*16.

Juniper's admitted modus operandi of using any means to "gain leverage against th[e] aggressor [plaintiff] and drive up their costs" also gives Monarch specific cause for concern that Juniper's preference for a slower docket may be a pretext for driving up Monarch's costs in this case specifically. Ex. 80 at 7, 13. Juniper's former Director of IP, Litigation and Strategy (Scott Coonan) spoke on a Best Practices in Patent Litigation panel hosted by Incisive Media Legal, where he candidly admitted that "[a]t Juniper our strategy is to discourage lawsuits by being creative and aggressive." *Id.* at 7. And by "creative and aggressive," Mr. Coonan made very clear that he meant taking every opportunity to "drive up [the plaintiff's] costs" to "gain leverage":

- "[I]f you're dealing with a plaintiff … who has his, its firm on a contingency basis[,] … you want to try to ***drive those costs up*** as much as possible. This is not rocket science." *Id.* at 13 (emphasis added).
- Find "another way to gain leverage against that aggressor and ***drive up their costs***." *Id.* (emphasis added).

- "You[r] lawyers need to be creative and they need to be looking for opportunities that both keep the opponent off balance and also ***drive up their costs***." *Id.* (emphasis added).

- "[Y]ou have to buy into the belief that the short term investment in that strategy pays off in the long term in a way that results in fewer law suits. You're a less attractive party to plaintiffs and we at Juniper Networks truly believe that." *Id.*

Certainly, Juniper may seek to "drive those costs up" in any district. But fairness favors denying any attempt to "gain leverage" by transferring this case away from the district where Monarch chose to file suit for a host of substantial reasons.

Juniper also vaguely invokes factor (ii) "forum manipulation" by arguing that "Monarch has also chosen to file at least two other lawsuits in other districts, further undermining any claim it may make that justice requires the case to remain in this District." Mot. at 13. Juniper does not *actually* accuse Monarch of venue manipulation, because the facts show that Monarch's prior venue choices were sound. Monarch twice sued Cisco: once in the Western District of Texas, and once in the Eastern District of Texas. In the former case, Cisco did not move to transfer venue at all, as the docket in *Monarch Networking Sols. LLC v. Cisco Sys., Inc.*, No. 20-cv-00381 (W.D. Tex.) reflects. In the latter case, the court ***denied*** Cisco's §1404(a) motion to transfer to the NDCA. *Monarch v. Cisco*, 2021 U.S. Dist. LEXIS 1551, at *38. And in seeking to impugn Monarch, Juniper also forgets its own practice of selecting whatever forum it pleases when proceeding as a plaintiff—including by filing suit in this very District.

In sum, subfactors (iv) "local interests," (iii) "docket congestion," and (ii) "forum manipulation" all weigh against transfer, while the remaining subfactors are neutral or irrelevant.

## IV.    CONCLUSION

All four of the § 1404(a) factors "for the convenience of parties and witnesses, in the interest of justice" weigh against transfer, and Juniper has markedly failed to meet its "heavy

burden of showing that the balance of interests weighs strongly in [its] favor." *Arabian*, 966 F.2d 1441. Monarch respectfully requests that the Court deny Juniper's Motion.

Dated: August 10, 2023                         Respectfully submitted,

                                               */s/ Walter D. Kelley, Jr.*
                                               Walter D. Kelley, Jr. (VSB No. 21622)
                                               HAUSFELD, LLP
                                               888 16th Street, N.W., Suite 300
                                               Washington, DC 20006
                                               Tel: (202) 540-7200
                                               Fax: (202) 540-7201
                                               wkelley@hausfeld.com

                                               Michael F. Heim (*pro hac vice*)
                                               Texas Bar No. 09380923
                                               mheim@hpcllp.com
                                               R. Allan Bullwinkel (*pro hac vice*)
                                               Texas Bar No. 24064327
                                               abullwinkel@hpcllp.com
                                               Alden G. Harris (*pro hac vice*)
                                               Texas Bar No. 24083138
                                               aharris@hpcllp.com

                                               Eric J. Enger (*pro hac vice*)
                                               Texas Bar No. 24045833
                                               eenger@hpcllp.com
                                               William B. Collier, Jr. (*pro hac vice*)
                                               Texas Bar No. 24097519
                                               wcollier@hpcllp.com
                                               HEIM, PAYNE & CHORUSH, LLP
                                               1111 Bagby St. Ste. 2100
                                               Houston, Texas 77002
                                               Telephone: (713) 221-2000
                                               Facsimile: (713) 221-2021

                                               Max L. Tribble Jr. (*pro hac vice*)
                                               Texas Bar No. 20213950
                                               mtribble@susmangodfrey.com
                                               Joseph S. Grinstein (*pro hac vice*)
                                               Texas Bar No. 24002188
                                               jgrinstein@susmangodfrey.com

31

SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Steven M. Shepard (*pro hac vice*)
New York Bar No. 5291232
sshepard@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

Steven M. Seigel (*pro hac vice*)
Washington State Bar No. 53960
sseigel@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

***COUNSEL FOR MONARCH NETWORKING
SOLUTIONS LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the forgoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to counsel of record in this case.

_/s/ Walter D. Kelley, Jr._
Walter D. Kelley, Jr.