1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF VIRGINIA
2         ALEXANDRIA DIVISION

3    --------------------------------x
                                     :
4    MONARCH NETWORKING SOLUTIONS, LLC: Civil Action No.:
                                     : 1:23-cv-670
5             Plaintiff,    :
         v.                          :
6                                    :
     JUNIPER NETWORKS, INC.,         : September 15, 2023
7                                    :
              Defendant.    :
8    --------------------------------x

9         TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE T.S. ELLIS, III,
10       UNITED STATES DISTRICT COURT JUDGE

11            A P P E A R A N C E S

12   FOR THE PLAINTIFF:    WALTER KELLEY, ESQ.
                           ALAN BULLWINKEL, ESQ.
13                         STEVEN SEIGEL, ESQ.
                           SUSMAN GODFREY, ESQ.
14                         Heim Payne & Chorush, LLP
                           1111 Bagby Street
15                         Suite 2100
                           Houston, TX 77002
16   FOR THE DEFENDANT:    JARED NEWTON, ESQ.
                           TODD BRIGGS, ESQ.
17                         JOSEPH REED, ESQ.
                           Quinn Emanuel Urquhart & Sullivan
18                         1300 I St NW
                           Suite 900
19                         Washington, DC 20005

20

21

22
     OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
23                                    United States District Court
                                      401 Courthouse Square
24                                    Tenth Floor
                                      Alexandria, VA 22314
25

Monarch Networking v. Juniper Networks

2

1                   **P R O C E E D I N G S**

2   (Court proceedings commenced at 10:30 a.m.)

3

4            THE COURTROOM CLERK:  The Court calls civil case

5   Monarch Networking Solutions, LLC versus Juniper Networks,

6   Inc.  Case No. 2023-cv-670.

7            May I have appearances, please, first for the

8   plaintiff.

9            MR. KELLEY:  Good morning, Your Honor.  Walter

10  Kelley on behalf of the plaintiff.  With me are some counsel

11  who have been admitted pro hac vice:  Steven Shepherd and

12  Steven Seigel of the Susman Godfrey firm.  And Alan Bullwinkel

13  of the Heim Payne firm in Houston.

14           Mr. Seigel is going to handle the argument on the

15  motion to transfer and Mr. Bullwinkel on the motion to

16  dismiss.

17           THE COURT:  All right.  Thank you, Mr. Kelley.  Let

18  me ask Mr. -- it will be -- on the motion to transfer, will

19  that be Mr. Bullwinkel?

20           MR. KELLEY:  Seigel.

21           THE COURT:  Seigel.  And Mr. Seigel is with what

22  firm?

23           MR. KELLEY:  He's with the Susman Godfrey firm.

24           THE COURT:  Yes.  Is Mr. Susman still around?

25           MR. KELLEY:  Well, they better tell -- he.

─Monarch Networking v. Juniper Networks─

3

1           Unfortunately died in a bicycle accident, Your

2    Honor.

3           THE COURT:  Because I had cases when I was a

4    practicing lawyer in which I locked horns with Mr. Susman and

5    I have memories of that.  I'm sorry to hear that.

6           MR. KELLEY:  I think Gary McGowan who you might have

7    known --

8           THE COURT:  Gary McGowan was my associate in a firm.

9           MR. KELLEY:  -- he went there.

10          THE COURT:  But he got so rich he retired.

11          MR. KELLEY:  He's doing ADR and getting even richer.

12          THE COURT:  He was doing okay before he did that.

13   He made the right decision to leave Hunton Williams because he

14   prospered quite well after that.  I hope if you see him you

15   offer him my best wishes.

16          MR. KELLEY:  I do.  I talk to Gary about once every

17   six months.

18          THE COURT:  Good, good.  Well, he was a diligent and

19   effective associate of mine.  Thank you.

20          Who is here for the defendant?

21          MR. NEWTON:  Good morning, Your Honor.  Jared Newton

22   from Quinn Emanuel Urquhart & Sullivan and I have with me my

23   partner, Todd Briggs, also from Quinn Emanuel, who will be

24   handling the argument today.

25          And then our associate, Joseph Reed.  And then we

─────Monarch Networking v. Juniper Networks─────

4

 1  also have a client representative in the gallery, Mr. Dave

 2  Saunders.

 3          THE COURT:  He can sit at counsel table if he wants

 4  to.  He doesn't have to, but I do allow clients to sit up

 5  there.

 6          MR. NEWTON:  Great.  We'll have him up.  Thank you.

 7          THE COURT:  All right.  All right.  Who will argue

 8  today on behalf of the defendant?

 9          MR. NEWTON:  That will be Mr. Briggs.

10          THE COURT:  All right.  And I know I have former

11  clerks at various law firms, including yours, Mr. Briggs.  But

12  I don't recuse myself, even if they appear to argue.  Just as

13  I wouldn't recuse myself if Gary McGowan appeared here, my

14  former associate.

15          But in any event, Mr. Briggs, you're arguing on the

16  motion to transfer, is that correct?

17          MR. BRIGGS:  That's correct, Your Honor.

18          THE COURT:  Well, let me see if I can organize this

19  for my benefit here.

20          There is at the threshold a motion to strike certain

21  evidence that you're familiar with.  And then after that it's

22  a standard 1404(a) motion to transfer.  So the first issue

23  that I'll hear on that will be whether the case could have

24  been brought against this defendant in the transferee forum.

25  And then once that matter is fully heard, I will then let you

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─Monarch Networking v. Juniper Networks─

5

1    address convenience of the parties, convenience of the

2    witnesses in the interest of justice, in that order.

3           So let's begin.  Mr. Briggs, right?

4           MR. BRIGGS:  That's correct, Your Honor.

5           THE COURT:  Mr. Briggs, let's begin with the motion

6    to strike.

7           MR. BRIGGS:  Yes, Your Honor.  The defendants have

8    filed or, I'm sorry, the plaintiff has filed a motion to

9    strike certain evidence.

10          THE COURT:  I'm aware of that.

11          MR. BRIGGS:  Yes.

12          THE COURT:  I probably thought and spent enough time

13   on it.  Look, let's do this.  The motion to strike really

14   should be heard first from Mr. Bullwinkel or Mr. Seigel.

15          MR. KELLEY:  It will be Mr. Seigel.

16          THE COURT:  Mr. Seigel.  And then I'll hear from you

17   on that.

18          MR. BRIGGS:  All right.  So you're going to take up

19   the motion to strike and then following that the motion to --

20          THE COURT:  That's correct.  They are the movant,

21   they get to go first.  You're the movant on the other, you get

22   to go first.

23          MR. BRIGGS:  Understood, Your Honor.

24          THE COURT:  All right.  Mr. Seigel.

25          I don't mean to try to intimidate you, Mr. Seigel.

Monarch Networking v. Juniper Networks

6

```
 1    I don't think I could.  But motion to strike, there's no
 2    basis.  Rule 6 doesn't require that.  Local rule doesn't
 3    require that.  The main thing is that the parties must have a
 4    reasonable opportunity to respond to the material that's being
 5    offered, as you would put it, late.  But I don't know of any
 6    authority that would strike it, do you?  I didn't see it in
 7    your brief.  Tell me what case you would rely on that would
 8    persuade or -- certainly not that compels me.  I don't see
 9    anything in the Fourth Circuit that would require me to strike
10    this evidence.
11         What is it that you would rely on to persuade me to
12    strike it?
13         MR. SEIGEL:  Perhaps strike is -- thank you, Your
14    Honor -- strike is a strong suggestion, and I think what we
15    were trying to convey in our motion was that we would be
16    comfortable with either disregarding the evidence, giving it
17    less credit or less weight in the transfer analysis, rather
18    than a full-fledged striking of the evidence from the record.
19    We're comfortable with the evidence being left in the record
20    as is.  I think our point was that because we were not given
21    an opportunity to respond to it --
22         THE COURT:  Well, you do have an opportunity.
23    You're here today.
24         MR. SEIGEL:  Certainly that is true with respect to
25    --
```

─────Monarch Networking v. Juniper Networks─────

7

1        THE COURT:  And there are cases that say that can be

2   enough.  The day before isn't enough, but here you had more

3   than the day before.

4        MR. SEIGEL:  Yes, Your Honor.

5        THE COURT:  I mean, the whole point is that I should

6   avoid unfair surprise and I should give you, under Rule 6, an

7   opportunity to respond and then take the matters under

8   advisement.

9        There are four matters that were raised -- I think

10  it was four.  Yes, the Galata office.  Your point on the

11  Galata office is simply that it doesn't make any difference to

12  the transfer calculus that their subsidiary has a Galata

13  office.

14        MR. SEIGEL:  That is correct.

15        THE COURT:  All right.  I understand your point.  We

16  don't need to take more time to argue that.

17        Who will argue this for the plaintiff -- defendant,

18  I'm sorry.  Mr. Briggs?

19        MR. BRIGGS:  Mr. Briggs, yes.

20        THE COURT:  You don't expect the Galata office to

21  figure much in the calculus, do you?

22        MR. BRIGGS:  No.

23        THE COURT:  You are right.  Let's continue.  What's

24  next?  The next one was the list of party witnesses they

25  allege would have relevant knowledge.  This is a fight over

1  whether the people that Monarch listed that appear on the

2  website to have some knowledge of the allegedly infringing

3  products.

4       MR. SEIGEL:  Yes, Your Honor, that's correct.  And

5  for purposes of this motion --

6       THE COURT:  I'm getting sort of a taste of my own

7  medicine.  I'm sure none of you went back far enough but I

8  think I wrote an opinion in 1988, when I was early on the

9  bench or '87 -- you were probably in grade school -- in which

10 I noted the fact that, look, we have to decide motions to

11 transfer at the beginning or it kind of defeats the whole

12 purpose of transfer, but one of the major factors is who are

13 the witnesses.

14       And I remember noting in an opinion that you all

15 didn't tell me why exactly what you think they are going to

16 say and why you think that's so material.  To which they

17 responded, well, the case just got filed, Judge, what do you

18 expect, we're just getting into it.

19       So I understand the parties' differences here.  They

20 say, look, we found this on the website, there are these

21 devices that we say infringe certain parts of the patent, and

22 you say they don't really know much about it.  They're just

23 salesmen.  That's what you say, right?

24       MR. SEIGEL:  That's what my colleagues are saying.

25       THE COURT:  That's what they say.

Monarch Networking v. Juniper Networks

9

1        MR. SEIGEL:  Correct, that's right, Your Honor.

2        THE COURT:  All right.  These are party witnesses

3   and it's not going to be that significant to the transfer

4   calculus --

5        MR. SEIGEL:  Understood, Your Honor.

6        THE COURT:  -- because they can appear wherever the

7   case occurs.  And they can be deposed.  I'm not too concerned

8   about those.

9        Nonparty witnesses are different.  Their convenience

10  matters more.  They don't have a dog in the hunt and they

11  don't like to be jerked around.  So I think I understand

12  enough about the parties' positions.

13       Basically these party witnesses that you've

14  identified from the internet, you have a basis for saying they

15  know about these products.  They're salesmen.  They're out

16  selling them.  And your client contends, look, those are

17  infringing products and so these people would have information

18  that might be important to showing infringement or not

19  infringement.  Right?

20       MR. SEIGEL:  You're sort of correct with a minor

21  clarification that the witnesses that we've identified are not

22  sales individuals but rather are engineers and in some cases

23  test technicians who are actually performing what we allege to

24  be the infringing steps in the --

25       THE COURT:  All right.  Well, that's helpful.  The

───Monarch Networking v. Juniper Networks───

10

1  fact that they're engineers -- I graduated as an engineer.  I

2  was not a very competent engineer based on four years.  And I

3  knew a lot of incompetent engineers.

4           All right.  I think I understand that part.  Then

5  there's argument about Juniper's source code, is that right?

6           MR. SEIGEL:  That's correct, Your Honor.  I think I

7  may be able to short circuit this as well.

8           THE COURT:  Yes.  That will be welcomed.

9           MR. SEIGEL:  I think that ultimately this is,

10  perhaps, something of an irrelevant point at this juncture

11  given that Juniper has made the argument that it only ever

12  produces source code in California.  So whether this case

13  proceeds here or in California, it will be producing its

14  source code in California.  The only party who will be

15  inconvenienced by that location is whoever our expert witness

16  is who has to evaluate that source code.

17           THE COURT:  And in the transfer calculus, the

18  location of expert witnesses gets a little weight.

19           MR. SEIGEL:  That's correct, Your Honor.

20           THE COURT:  Because you can choose expert witnesses

21  wherever.

22           MR. SEIGEL:  Certainly that is true.  So I think

23  that for purposes of this analysis the source code -- the

24  question of where it is produced is immaterial in terms of

25  determining whether a factor favors or disfavors transfer.

─────Monarch Networking v. Juniper Networks─────

1    THE COURT:  All right.  And then the last issue is

2   sales data.  But that's the same as source code.  Sales data

3   exists and it's going to be produced, if it's necessary, and

4   it doesn't really matter where it comes from.  Does it?

5    MR. SEIGEL:  This is a slightly separate argument.

6   Juniper is making a substantive -- in their reply in support

7   of their transfer motion, Juniper was providing evidence of

8   the number of units that it shipped to the state of Virginia

9   in comparison to the number of units that it shipped to the

10   state of California in the past five years, I think.  And

11   tried to make the comparison on a statewide basis that they

12   sell 1.6 or 1.6 percent of their units went to Virginia versus

13   30 percent to California in an effort to rebut the evidence

14   that we put in our opposition showing that Juniper practices

15   the methods here in Virginia.

16    We explained that we think it's an apples to oranges

17   comparison and doesn't really respond to the evidence that we

18   put forward explaining why Virginia is a locus of infringing

19   activity.  And why we believe that --

20    THE COURT:  Well, the answer to that they say is,

21   it's not a major focus.

22    MR. SEIGEL:  Correct.  That is their argument.

23   That's right, Your Honor.

24    THE COURT:  But not striking this.  I think I've

25   heard enough on the motion to strike.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─Monarch Networking v. Juniper Networks─

12

1              Let's go to your colleague now on the various

2     transfer issues -- not colleague, but your opposing counsel.

3     That will be Mr. Briggs.

4              MR. BRIGGS:  Good morning, Your Honor.

5              THE COURT:  Could the suit have been brought in the

6     Northern District of California?

7              MR. BRIGGS:  Yes, there's no dispute about that.

8              THE COURT:  All right.  So that issue is covered.

9              MR. BRIGGS:  Correct.

10              THE COURT:  The next issue is convenience of the

11     witnesses.  And here I'm talking about really let's divide

12     this between nonparty witnesses and party witnesses.

13              MR. BRIGGS:  Yes, Your Honor.  So with respect to

14     party witnesses, I think it's important to understand that

15     Juniper's headquarters is in Sunnyvale, California, which is

16     just outside of San Jose, California, within the Northern

17     District of California.

18              Juniper has approximately 2,000 employees that work

19     out of the Sunnyvale location.  It is the nerve center of

20     Juniper's company, Sunnyvale.  That's their headquarters.  So

21     a lot of the key development and design activities for the

22     accused products and the accused features of the accused

23     products occur there.  They also occur in China and India, but

24     none occur here in the Eastern District of Virginia.

25              The key sales and marketing people that would likely

—————Monarch Networking v. Juniper Networks—————

13

1  testify at trial would be located in Juniper's Sunnyvale

2  location.  And other finance people -- basically all of the

3  key people that we would bring to trial are in the Sunnyvale

4  location or perhaps maybe in China or India.  None are in the

5  Eastern District of Virginia.  So that's Juniper's party

6  witnesses.

7          Now, if we turn to Monarch's party witnesses,

8  Monarch is a California company.  They have nothing in the

9  Eastern District of Virginia.  They are a subsidiary of

10  Acacia, whom you may have heard of before.  Acacia is a

11  company who's known to acquire patents, create subsidiaries,

12  and assert them and attempt to license them.  But Monarch and

13  Acacia are both located down in Southern California.

14          THE COURT:  Known in the trade as a nonpracticing

15  entity.

16          MR. BRIGGS:  That's correct, Your Honor.

17          THE COURT:  Nonproducing entity.

18          MR. BRIGGS:  Nonpracticing entity is the term that

19  people use.

20          THE COURT:  There's no law against nonpracticing

21  entities.

22          MR. BRIGGS:  There is no law against nonpracticing

23  entities.  But the point is the parties associated with

24  Monarch or the individuals, there's three of them, two of them

25  are located in California, one is in Texas.  Nobody is here in

14

1   the Eastern District of Virginia.

2          So for those parties Northern District of California

3   would be more convenient as well.  Now, they may say they

4   don't mind if they come to the Eastern District of Virginia,

5   but the bottom line is it's a short flight from Los Angeles to

6   the Bay area.

7          THE COURT:  Well, I'm not really -- all right, go

8   ahead.  I'm sorry.  I interrupted you.  Go ahead, sir.

9          MR. BRIGGS:  Okay.  So the point is for party

10  witnesses, almost all of them are already in California and

11  almost all of them are in the Northern District of California.

12         Now, if we turn to --

13         THE COURT:  Nonparty witnesses.

14         MR. BRIGGS:  Nonparty witnesses.

15         Juniper has identified, at this stage of the case,

16  several different nonparty witnesses that are in the Northern

17  District of California.  An important one is an organization

18  called the IETF.  And what the IETF is is an organization who

19  develops standards for computer networking equipment, and

20  that's what's at issue in this case.  Certain protocols and

21  different mechanisms involved with this computer networking

22  equipment that was developed out of the IETF.

23         And you can see this in the plaintiff's complaint.

24  What they're focusing their infringement allegations on are

25  certain standards that are promulgated by the IETF.

──────Monarch Networking v. Juniper Networks──────

15

1        So you might ask yourself:  Where is the IETF

2   located?  It's in the Northern District of California.  It's

3   in Fremont, California.  I'm not sure if you're familiar with

4   the Bay area, but that's maybe 10 miles away from San Jose,

5   maybe 15 miles from Sunnyvale.  So, again, this is a very

6   important third-party witness and they are located in the

7   Northern District of California.

8        Now, on that point, Monarch dug up some records and

9   apparently the IETF, their corporate structure, is some type

10  of trust that was -- that was created in Virginia.  But

11  there's no evidence at all that there's any, you know, aside

12  from incorporating here, that there's any witnesses from the

13  IETF or anything like that, any documents or anything located

14  here.  The headquarters for the IETF is in the Northern

15  District of California.

16       We also identified a couple of prior art witnesses,

17  whom we think will have prior art to the patents in suit.  And

18  obviously, we haven't conducted discovery yet, Your Honor, but

19  if these prior art witnesses turn out to be key witnesses who

20  describe how these inventions occurred prior to the filing of

21  the patents that are being asserted against us, we could not

22  compel them to come and testify in this courtroom.

23       THE COURT:  Have you listed these people?

24       MR. BRIGGS:  Excuse me?

25       THE COURT:  Have you listed these people?

─Monarch Networking v. Juniper Networks─

16

1          MR. BRIGGS:  We did list these people in our brief.

2          THE COURT:  You can get prior art references right

3    from the patent itself.

4          MR. BRIGGS:  Did we --

5          THE COURT:  If the PTO was careful about assembling

6    prior art before issuing the patent.

7          MR. BRIGGS:  Yeah.  These particular -- if you're

8    asking me if these particular witnesses were --

9          THE COURT:  No, I just want to know whether you've

10   identified prior art witnesses.

11         MR. BRIGGS:  We have.  We have.  And we've

12   identified several that are located in the Northern District

13   of California.

14         So taking a step back, convenience of the witnesses,

15   again, Monarch is in California, Juniper is in California,

16   most of those party witnesses are in California, the IETF is

17   in California, these prior art witnesses are in California.

18   So the witnesses that are likely to testify at trial are very

19   closely connected with California and the Northern District of

20   California.  An extremely strong connection.

21         On the other hand, Monarch has identified -- they've

22   tried to identify witnesses that could somehow be associated

23   with this case in the Eastern District of Virginia, but none

24   of these witnesses that they've identified appear to have any

25   particular relevant knowledge that would be any different than

Monarch Networking v. Juniper Networks

17

1    witnesses in all kinds of different districts in the United

2    States.

3          You know, maybe other Juniper engineers are in Texas

4    and they have a general knowledge of some of this information

5    or maybe some are located in Washington state or something

6    like that.  But none of the witnesses they've identified have

7    the -- have specific knowledge that's associated with this

8    case, and I think that's what's very important.

9          So the bottom line is, Your Honor, is for

10   convenience of the witnesses, this case has an extremely

11   strong connection to the Northern District of California and a

12   tenuous connection, at best, to the Eastern District of

13   Virginia.

14         And then finally, unless you have further questions

15   about convenience of the parties or the witnesses, I'll turn

16   to the last factor you requested that I address and that is

17   the interest of justice.

18         And it's very well established that this factor in

19   patent cases is heavily influenced by where the allegedly

20   infringing products are developed and sold from.  There's many

21   cases on that.  The Apple case we cite in our brief, the

22   Juniper 1 case, the Juniper 2 case, those were both cases that

23   Juniper took up to the Federal Circuit, and the Federal

24   Circuit recently affirmed that the Northern District of

25   California was the proper place for the case to be.

─────Monarch Networking v. Juniper Networks─────

18

1        There's also a case that Your Honor issued almost

2   two years ago exactly, the *Mira v. Google* case.  You affirmed

3   that principle.  And then also the *Samsung* case.

4        But all of those cases say that the local interest

5   factor, which is a focus of the interest of justice factor,

6   the local interest is strongest where the accused products

7   were primarily designed and developed.  And that's in

8   Sunnyvale, California.  No designing development of the

9   products occurred in the Eastern District of Virginia.

10       And then finally, a smaller issue with respect to

11  the interest of justice factor is court congestion.

12  Plaintiffs often raise this court congestion factor and they

13  file in districts that have a fast time to trial.  For

14  example, this district, or maybe the Western District or

15  Eastern District of Texas.  And they argue that that's faster

16  than the Northern District of California.  The Northern

17  District of California is more congested.  And based on that,

18  in the interest of justice factor, the case should stay out of

19  the Northern District of California.

20       Well, the Federal Circuit has addressed that

21  argument many times head on recently.  And you can look at the

22  Juniper 1 and 2 cases that we cite in our briefs.

23       And the Federal Circuit basically gives that

24  argument very little weight, very little weight.  And they

25  often refer to it as speculative, because it's very difficult

Monarch Networking v. Juniper Networks

19

1    to know when a case is actually going to get to trial.

2              So in sum, the interest of justice factor also

3    weighs heavily in favor of transferring this case to the

4    Northern District of California.

5              THE COURT:  Why is that?

6              MR. BRIGGS:  Well, again, because the key aspect of

7    that factor is where the accused's products are designed and

8    developed.  And that's in the Northern District of California.

9    That means that the Northern District of California has a

10   strong local interest in this case.

11             Again, if you look at the Apple, Juniper 1, Juniper

12   2, Your Honor's case, *Mira*, and the *Samsung* case, they all

13   support that principle.

14             THE COURT:  All right.  Thank you.

15             MR. BRIGGS:  You're welcome.

16             THE COURT:  All right.  Now we'll turn back to

17   Mr. Seigel or Mr. Bullwinkel.

18             MR. SEIGEL:  Thank you, Your Honor.

19             THE COURT:  It's Mr. Seigel.

20             MR. SEIGEL:  Mr. Seigel, that's correct.

21             THE COURT:  Mr. Bullwinkel is here for the motion to

22   dismiss.

23             MR. SEIGEL:  That's correct, Your Honor.

24             THE COURT:  All right.  Thank you.  Go ahead, sir.

25             MR. SEIGEL:  I would like to begin with a point of

1  emphasis that the Federal Circuit has made very clear in

2  addressing transfer analyses, which is they are fact bound and

3  they should be determined on the facts of the record before

4  the Court.  And in this case, that record is actually quite

5  significant in why we selected Virginia as the location to

6  bring suit.

7          In fact, there are two reasons:  One, of course, was

8  that we were unable to bring suit in our home district in the

9  Central District of California because it's not a proper place

10 of venue under the proper venue statute 28 U.S.C. 1400(b).

11 Juniper does not maintain a place of business there, so we

12 could not sue them there.

13         THE COURT:  But you could sue them in the Northern

14 District.

15         MR. SEIGEL:  Certainly.  That's correct, Your Honor.

16         THE COURT:  And that's pretty close to where you

17 live in California.

18         MR. SEIGEL:  That is correct, Your Honor.

19         THE COURT:  All right.

20         MR. SEIGEL:  But one of the reasons why we selected

21 Virginia was because the evidence that we were able to obtain

22 in our due diligence, prior to filing suit, demonstrated --

23 you will recall, this case is what we assert a combination of

24 both apparatus claims, which focus on the product, and method

25 claims, which focus on where an actor, namely Juniper, has

──────Monarch Networking v. Juniper Networks──────

21

1   performed the steps of the method.

2           Virginia happens to be a place where Juniper

3   maintains a couple of important facilities.  One, its office

4   is home to its proof of concept testing laboratory where

5   Juniper puts in place test topologies, which is just a

6   networking word for setting up a network to model it and see

7   how it works.  It does that from its Herndon office.  And we

8   have evidence that not only does it do that generally, but

9   specifically it has done that with respect to the

10  functionalities that we have accused of infringement in our

11  case.

12          They maintain documentation about those tests, they

13  perform those tests, and they also conduct training where they

14  train both their own staff and also customers on how to use

15  the functionality from this Herndon office.

16          So we put that evidence in our record because that

17  was the evidence that we were able to obtain of where Juniper

18  is actually infringing the methods.

19          THE COURT:  Does the defendant infringe in Northern

20  District of California?

21          MR. SEIGEL:  It may but the defendant has not put in

22  any record evidence saying that what we point to as evidence

23  of infringement for the purposes of the method claims.

24          THE COURT:  So you're telling me that you don't plan

25  to introduce any evidence that the defendant infringes in the

—Monarch Networking v. Juniper Networks—

22

1    Northern District of California?

2              MR. SEIGEL:  No, Your Honor, that's not it at all.

3    What I am saying is that --

4              THE COURT:  Of course not.  You know that if they

5    infringe, they'd probably do it out of their home office and

6    nearby as well.

7              MR. SEIGEL:  That is true, Your Honor.  But on a

8    1404(a) analysis, the burden in the Fourth Circuit, the burden

9    rests with the movant.  And the record that they make in

10   moving for transfer is the record that governs this inquiry.

11             And they did not put in -- they've certainly put in

12   evidence that unit counts in terms of sales of products that

13   they've shipped to Virginia versus California, but they have

14   not rebutted any of the evidence that we've put in the record

15   showing that Virginia is a critical place where they are doing

16   testing that they don't do anywhere else in the United States.

17   At least we are not aware of what they're doing, but we do

18   have evidence that they are doing it here.  So that's an

19   important fact at the outset.

20             I would like to address a couple of the things on

21   the issue of both party witnesses and nonparty witnesses.  On

22   party witnesses, there are two problems that we have with the

23   witnesses that Juniper identified.  Juniper said that they

24   have 2,000 employees at their headquarters.  We don't dispute

25   that.

23

1        But the five technical witnesses that Juniper

2   identified in its motion, three are identified as having

3   knowledge of what is called MAP-E functionality.  And two are

4   identified as having knowledge of EVPN and VPLS functionality.

5        What Juniper does is it says here are the five

6   witnesses, they have some knowledge of these products.

7   Juniper doesn't say how much knowledge.  They just say they

8   have some knowledge.  And they don't differentiate between any

9   of those witnesses, so they just say, "Here are some people."

10        What we tried to do in our opposition was identify

11   entities with specific knowledge that was even more specific

12   than just general awareness of those functionalities.  And we

13   identified them with specific purposes.  One of the witnesses

14   we identified was somebody who does configurations and

15   testing.  That's important for us for purposes of showing

16   inducement, it's important for us for purposes of

17   demonstrating that Juniper itself has performed the methods

18   that we are accusing of infringement.

19        And we also identified witnesses who have knowledge

20   of MAP-T functionality, which is another functionality that we

21   accused in our complaint.  Juniper has not identified any

22   witnesses that have such knowledge in Sunnyvale.

23        And interestingly, in the reply brief Juniper raised

24   the bar for what it considers to be relevant knowledge for

25   witnesses.  They said, "It's not sufficient that they just

1    have general knowledge of EVPN and VPLS functionality."  No,

2    what is required is that they have knowledge of

3    point-to-multipoint label switch paths over an EVPN or VPLS

4    domain using pseudowires.

5           Now, what's interesting about that argument is that

6    none of their witnesses that they identified are identified as

7    having that knowledge.  But in their reply, in their

8    declaration that their declarant submitted in their reply

9    brief, he concedes that three of the witnesses that we

10   identified from our public research do have that knowledge.

11          So Juniper has effectively said none of the

12   witnesses that we identified have the specific knowledge that

13   we think is critical, but the ones that you did identify that

14   are based here in this district, or close by, they do have

15   that knowledge.

16          So with respect to party witnesses, I recognize that

17   they're not as significant in the analysis, but I do think it

18   is important to note that the ones that have the most relevant

19   knowledge are the ones that we identified and the ones that

20   are based here.

21          With respect to nonparty witnesses, a couple of

22   points.  The first is that Juniper identifies IETF, which is

23   the Internet Engineering Task Force.  They don't identify any

24   witness associated with IETF for a good reason, which is that

25   IETF is just a body that receives documents.  It acts as an

1    administrative function.

2          The people who have relevant substantive knowledge

3    of the actual standards documents themselves are the authors

4    of those documents.  Juniper has employees who write

5    standards.  The original owner of the patents, Orange Telecom,

6    they had authors of these documents.  Those are the

7    individuals who have knowledge of the actual contents and

8    substantive work that happens within the IETF documents.

9          So that's why Juniper didn't identify any specific

10   witnesses from IETF that it believes would be relevant to this

11   case.  And as a point from -- as a reference point from

12   Monarch's prior case against *Cisco* in the Eastern District of

13   Texas, that case settled within two weeks of trial, and it

14   asserted the same patents, the same technology was at issue.

15   There wasn't a deposition from anybody from IETF and nobody on

16   their trial witness list.  So IETF played almost no role in

17   that case, despite the fact that it is almost identical to the

18   case that we are bringing here against Juniper.

19          THE COURT:  But it was a different defendant.

20          MR. SEIGEL:  Certainly, that is true.

21          THE COURT:  All right.

22          MR. SEIGEL:  That's correct, Your Honor, but I think

23   that --

24          THE COURT:  Lawyers are different.

25          MR. SEIGEL:  They are.

Monarch Networking v. Juniper Networks

26

1      THE COURT:  And they might well have different views

2  about what evidence to present and what defenses to -- so I'm

3  not much moved by that.

4      Go ahead and finish your argument.

5      MR. SEIGEL:  My point is that if they actually had a

6  specific piece of information that they needed from the IETF,

7  they would have specified what that was in their motion, but

8  they didn't.  They just said this is a potential -- I mean,

9  this case has been litigated almost all the way through trial

10  in a prior case, and there's a very substantive record from

11  which --

12      THE COURT:  Is that the case you mentioned, the one

13  that's in Texas?

14      MR. SEIGEL:  That's correct, Your Honor.

15      THE COURT:  Why don't you all go to Texas?

16      MR. SEIGEL:  Maybe.  You know, well, the truth is

17  there's -- Juniper really doesn't do anything in Texas as far

18  as I'm aware.

19      THE COURT:  I'm puzzled by why everyone wants to be

20  here.  They obviously don't come to my courtroom.  Nobody who

21  has a case in my courtroom before me would want to come back.

22      That's all right, I don't mind it.

23      MR. SEIGEL:  But I think, given that it is Juniper's

24  burden to specify what they need from these witnesses, merely

25  identifying an organization and saying we might need something

1  from them, doesn't really satisfy that burden.  They need to

2  specify what and why, and they haven't said.

3           So the other two witnesses that they've identified

4  are prior art witnesses.  And I think Your Honor has sort of

5  touched on this with respect to the fact that most of the

6  issues are going to be in publications themselves.

7           The specific witnesses that Juniper identified are

8  two among, I want to say nine or ten, that could potentially

9  be drawn from other witnesses.  They happen to pick the ones

10 that are based in the Northern District of California rather

11 than looking at any of the other prior art witnesses that are

12 based overseas or closer to the east coast.

13           THE COURT:  Because they can't be subpoenaed.

14           MR. SEIGEL:  They can be subpoenaed for purposes of

15 deposition.  Whether they're important for trial --

16           THE COURT:  Sure, but that's in a jury case.  Have

17 you asked for a jury?

18           MR. SEIGEL:  Yes, Your Honor.

19           THE COURT:  All right.  In a jury case, I think as

20 you know as an experienced lawyer, juries pay attention to

21 live witnesses.  They don't pay much attention to reading

22 depositions.

23           MR. SEIGEL:  I agree.

24           THE COURT:  And they aren't much taken with the

25 usual theatrical device used in trials to put someone in the

─────────Monarch Networking v. Juniper Networks─────────

28

1  witness stand and someone ask me questions.  It's not only

2  boring but not very impressive.

3          MR. SEIGEL:  I would agree, Your Honor.

4          THE COURT:  Depositions by video are better but not

5  much better.  Watching the tube is different from watching a

6  live witness.

7          All right.  I think I understand your argument.  In

8  fact, I understand both arguments.  You've both said

9  essentially here what you've said in your briefs.

10          MR. SEIGEL:  I wanted to point out one thing that

11  did change as a result of the briefing in this case.

12          THE COURT:  Yes, go right ahead.

13          MR. SEIGEL:  So we identified three third-party

14  witnesses that are based here or near this district:  one in

15  D.C., one in Virginia, and one in Tennessee.  Juniper has

16  added to the ranks of those third-party witnesses from whom we

17  would like information because by making clear that we

18  identified them in our opening brief as party witnesses, they

19  are now former Juniper employees, so they are now in the ranks

20  of the nonparty witnesses.

21          I recognize they may not play a significant role in

22  the analysis given that both of them are outside of this

23  state, but we do have two that are within the subpoena power

24  of this state that are significant for purposes of that

25  analysis at the very least.

Monarch Networking v. Juniper Networks

29

1          THE COURT:  These are former employees?

2          MR. SEIGEL:  Yes.

3          THE COURT:  Have you interviewed them?

4          MR. SEIGEL:  We have not, Your Honor.

5          THE COURT:  So how do you know what they're going to

6     say that's important?  You don't.

7          MR. SEIGEL:  I don't.  But I think that the same

8     question I would ask that be -- to add to why the prior art

9     witnesses that Juniper selected are important.

10         THE COURT:  Well, if I ask them, have you spoken to

11    these people, they're likely to tell me, "Yes."

12         MR. SEIGEL:  That is possibly true.  I don't know.

13         THE COURT:  All right.  I think I understand this.

14         Anything further, sir?  Because I'm going to take a

15    brief recess before I go on to hear any response and go on to

16    what, if anything, I'm going to hear on the motions to

17    dismiss.

18         MR. SEIGEL:  One final point, Your Honor, and this

19    is in response to our status as a nonpracticing entity.  I

20    just wanted to flag that in the *Trustees of Columbia*

21    *University* case, which we identified in our papers, with

22    respect to the deference to the plaintiff's choice of forum,

23    that case is quite analogous to ours insofar as the plaintiff

24    was a nonpracticing entity, specifically Columbia University.

25    The defendant was *Symantec Corporation*, which was based in the

Monarch Networking v. Juniper Networks

30

1   Northern District of California.

2           There was no dispute that the products in that case

3   that were accused of infringement were developed from the

4   Northern District of California.  And that the predominate

5   focus of the product, for purposes of apparatus claims, was

6   the Northern District.

7           But this Court retained jurisdiction over that case

8   -- another district court in this district retained

9   jurisdiction over that case here, despite the fact that it was

10  not Columbia University's home, despite the fact that the

11  products were made in California.  Because this district had

12  an important role for purposes of evidence with respect to the

13  method claims.

14          And so, I just wanted to say that that case rebuts

15  some of the stronger more muscular arguments that my opposing

16  counsel have made that our status as an NPE, as a

17  nonpracticing entity, should be disregarded for purposes of

18  our choice of forum.

19          Thank you, Your Honor.

20          THE COURT:  All right.  I'm going to take a

21  15-minute recess.  And then when I reconvene, Mr. Briggs, you

22  will have an opportunity to respond to the argument that

23  you've heard.

24          Court stands in recess for 15 minutes.

25          (Recess.)

Monarch Networking v. Juniper Networks

31

 1              (Court proceedings resumed at 11:53 a.m.)

 2              THE COURT:  Thank you for your patience.  I

 3    apologize but other matters intervened.

 4              But let's go back now, Mr. --

 5              MR. KELLEY:  Judge Ellis.

 6              THE COURT:  Yes.

 7              MR. KELLEY:  Before Mr. Briggs begins his rebuttal

 8    argument, would you indulge Mr. Seigel for just two points?

 9              THE COURT:  Yes, of course.

10              He probably should have asked for it himself, and I

11    would have granted.  It doesn't make any difference that

12    Mr. Kelley asked for it.

13              MR. KELLEY:  Justifying my existence, Your Honor.

14              THE COURT:  All right.

15              MR. KELLEY:  Thank you very much, Your Honor.

16              THE COURT:  You don't have to justify it to me, but

17    you have to justify it to the client who is paying you more

18    money per hour than I ever saw.

19              Go ahead.

20              MR. SEIGEL:  Thank you, Your Honor.

21              THE COURT:  But I'm not -- when I took this job, I

22    think we were -- my recollection is that district judges were

23    paid $9,600 a year.  I don't remember exactly.  It was 1985 or

24    '86 when it happened.  I don't remember now.  But, it's more

25    than that now.  Not a lot, and certainly not in the realm, but

Monarch Networking v. Juniper Networks

32

1  that's a choice, and I made the choice, and I'm glad I made

2  the choice.  I enjoy it.  It's what I wanted to do.

3          People don't understand that the only thing I ever

4  wanted to do in life was to be a Naval aviator, fly off

5  carriers.  I did that.  But I learned that I couldn't do it

6  for life and I had to find something else.

7          And of course, I could read and write.  And if you

8  can read and write, guess what, you can do law.  Because

9  that's all you need to do is read and write.  So I did what

10  was socially acceptable.  I went to law school.

11          And then I thought -- and my -- I don't remember

12  what my starting salary was as a district judge, but I do

13  remember my starting salary at the firm was only, I think it

14  was $9,000 a year.  And I thought I was overpaid.  You know

15  what?  I was right.  I knew nothing.  And I'm reminiscing a

16  lot about that recently.  I did a lot of work for Lewis

17  Powell, who became Justice Powell.  Interesting life.

18          Yes, sir.  Go ahead.  You had some additional points

19  you didn't mention that you would like to.  Proceed.

20          MR. SEIGEL:  Thank you, Your Honor.

21          This sort of dovetails with the question of

22  third-party witnesses, and I just wanted to make sure I made

23  this point clearly, which was that the reason that we focus so

24  heavily on Herndon, Virginia and Juniper's operations in

25  Herndon is because it is a place where -- and this -- this is

1    important for our method claims, both for purposes of direct

2    infringement but also for purposes of induced infringement.

3           And the way that our claims work in that context is

4    that we have to provide and adduce specific evidence not only

5    that Juniper specifically performs the method steps itself.

6    And that can't be done by shipping a product somewhere.  It

7    has to be done by Juniper itself.  It must perform all of

8    those steps.

9           And for the induced infringement claims, Juniper has

10   to induce its customers and instruct them and show them how to

11   perform those steps and encourage them to do so.

12          So a critical aspect of these Herndon operations

13   here is that it is where Juniper brings all of its customers

14   to train them, it is where it brings them to test their

15   equipment and to configure them in a way that will perform the

16   method, and it's where then those customers return to

17   implement those methods in a way that results in induced

18   infringement, and the evidence for which we will seek in

19   discovery in this case.

20          And critically, some of the largest customers that

21   we're talking about are based here.  We're talking about

22   Cloudflare, Lockheed Martin, General Dynamics, Verizon, and

23   even Amazon.  These are third parties from whom we will be

24   unable to obtain trial testimony if this case is transferred.

25   And those are people that are being instructed here on how to

─────Monarch Networking v. Juniper Networks─────

34

1  perform the methods and how to induce infringement here in

2  Juniper's Herndon office.

3          THE COURT:  All right.  Thank you.

4          MR. SEIGEL:  Just one very brief point on the prior

5  art witness.

6          And I apologize, thank you for indulging me, Your

7  Honor.

8          THE COURT:  The lesson you should take away is don't

9  do this again.  Go ahead.

10          MR. SEIGEL:  Thank you, Your Honor.

11          THE COURT:  That is, don't omit something from your

12  argument and expect that you will have an opportunity to

13  insert it later, but go ahead.

14          MR. SEIGEL:  Thank you, Your Honor.

15          The prior art witnesses that Juniper identified are

16  from a practical perspective legally irrelevant.  The legal

17  test for anticipation and for obviousness with respect to

18  printed publications, and the witness that they identified is

19  associated with a printed -- an author of a printed

20  publication.

21          The test for whether that printed publication

22  invalidates a patent under either the anticipation or

23  obviousness standard is based on what is written on the face

24  of that document.  Nothing beyond it.  And I will challenge

25  Mr. Briggs, if he knows of any case in which a third-party

──Monarch Networking v. Juniper Networks──

35

1   author of a prior art publication has ever been called to

2   trial to testify as a fact witness about what is contained

3   within the four corners of that document.

4          THE COURT:  Well, I've had cases where that's

5   occurred.

6          MR. SEIGEL:  Okay.  Then I don't need to challenge

7   Mr. Briggs.

8          THE COURT:  No, I don't think that would pay off.

9   But I take your other point.  I think it's -- I've listened to

10  you carefully and I understand why you want to make those

11  points and emphasize them.

12         All right, Mr. Briggs, now your opportunity to

13  respond to all of that.  You've had an opportunity to reflect

14  on it, and I hope you can be specific and cover all the points

15  that they've made.

16         MR. BRIGGS:  Thank you, Your Honor.

17         I'll work backwards.  I won't touch the prior art

18  witness point that Mr. Seigel just made.  I agree that if

19  you're looking at a patent, you need to look at the four

20  corners of the patent and compare that to the prior art patent

21  and compare it to the asserted claims.

22         THE COURT:  That's for anticipation.

23         MR. BRIGGS:  Right.

24         THE COURT:  Not for obvious reasons.

25         MR. BRIGGS:  Yes.  However, there's more to that

36

1    story before a jury, right.  A jury might want to hear how

2    that patent was created, the context, those types of things.

3    So that's all very important to putting on a prior art case.

4    And maybe some attorneys don't bring in prior art witnesses to

5    do that, but that's -- that's something that we like to do

6    with prior art of any type.

7             Next, turning to the point that was just made about

8    the third-party witnesses and the inducement claims and the

9    fact that -- I believe they said that Juniper brings all of

10   its customers to Virginia to do testing.  That's -- that's

11   simply not true at all.

12            THE COURT:  That's not in this record anyway.

13            MR. BRIGGS:  It's far from the truth.  We have many

14   other --

15            THE COURT:  To say that he's alleged that at least

16   some come to Virginia.

17            MR. BRIGGS:  Some come to Virginia, yes.  And again,

18   we have sales data showing that 1.6 percent of the U.S. sales

19   occur in this district, 30 percent in the Northern District of

20   California.  The remaining, however many percent that is --

21            THE COURT:  To the extent that they want to show

22   inducement, there's plenty of opportunity in California.

23            MR. BRIGGS:  There's plenty there, there's plenty

24   all over the United States.  There's nothing special about the

25   Eastern District of Virginia.

Monarch Networking v. Juniper Networks

37

1    Turning back to the point that was made right before

2  Your Honor took a break.  Mr. Seigel placed some emphasis on

3  the *Columbia v. Symantec* case, and I just wanted to comment on

4  that briefly.  That case was very, very different than this

5  case.  And it was very, very different than a garden-variety

6  patent infringement case that's trying to be transferred.

7    In that case, there were also these very unique tort

8  and inventorship claims that stemmed from events and

9  communications occurring in this district.  And there were

10 allegations of common law torts of fraudulent concealment,

11 unjust enrichment, and conversion, as well as the omission of

12 professors Stolfo and Keromytis as inventors of the '643

13 patent.

14    So that case had some extremely unique facts that

15 are very different than a garden-variety patent infringement

16 case like this one.  And I think that those facts persuaded

17 the Court not to transfer the case in *Symantec*.

18    Again, working backwards, and this goes to the party

19 witnesses issue.  Counsel made a point, and I think if I heard

20 him correctly, he said that Juniper conceded that three of the

21 witnesses in the Eastern District of Virginia, that they had

22 identified in their briefing, had more relevant knowledge than

23 witnesses that Juniper identified in its briefing that were in

24 Sunnyvale.  That's incorrect.  We did not make any such

25 concession.

Monarch Networking v. Juniper Networks

38

1          We simply said that these engineers had heard of --

2     at least heard of this specific accused feature that is at

3     issue in this case, and this feature was the point-to-point

4     feature that he mentioned using the EVPN technology.

5          So they merely heard of that.  They were not

6     involved in the design or the development of that feature or

7     anything of that nature.  That occurred in Sunnyvale and/or

8     India and China.  So there was no unique design and

9     development of that feature here in the Eastern District of

10    Virginia.

11         Another point to make on those three witnesses is

12    that relates to this EVPN feature.  That's only accused of

13    infringing one of the four patents in this case.  The other

14    three patents all relate to a completely different feature.

15         And I guess finally, I'd like to end by -- by

16    reemphasizing a point that I think I might not have emphasized

17    enough in my initial argument, and that's that when you have

18    nonpracticing entities, their choice of venue gets very little

19    deference, very little deference.  Even if they were to have

20    an office in the district.  There are cases, which we cite in

21    our briefing, that say they have very little deference as to

22    their forum.

23         And so, in closing, Your Honor, this case belongs in

24    the Northern District of California.  We believe it's very

25    clear, we believe there's a very strong case that the center

Monarch Networking v. Juniper Networks

39

1    of gravity is in the Northern District of California, and we

2    respectfully request that the Court transfer this case to the

3    Northern District of California.  Thank you.

4              THE COURT:  All right.  What I'm going to do now is

5    to hear, very briefly, on the motion to dismiss.  You're here

6    and I do want to hear, but I have questions.  The matter has

7    been fully briefed.  If I retain this case in this district, I

8    can't imagine that you all would have more to say than you've

9    already said in your extensive briefs.  I think the total

10   number of pages in these briefs has to be close to 100.

11             So what I would seek to do is to ask some questions

12   that I have and give you all a brief opportunity to say

13   anything you'd like to in addition to that but maybe limit you

14   on the amount of time that you have.

15             MR. BRIGGS:  Your Honor, one point on the motion to

16   dismiss.

17             THE COURT:  Yes.

18             MR. BRIGGS:  I was going to handle the first two

19   issues in our motion.  I was going to have Mr. Reed handle the

20   second two issues relating to inducement and willfulness.

21             THE COURT:  All right.  The questions I have don't

22   get to that.  I don't think those are difficult.  I think

23   those are adequately briefed.

24             MR. BRIGGS:  Okay.

25             THE COURT:  You had an expert report, am I correct,

─────Monarch Networking v. Juniper Networks─────

40

1  Mr. Briggs?

2          MR. BRIGGS:  Monarch had the expert report.

3          THE COURT:  That's right.  Let me go to Monarch for

4  a minute.  Mr. Bullwinkel.

5          Mr. Bullwinkel, how is the expert report properly

6  before the Court on the motion to dismiss?

7          MR. BULLWINKEL:  Your Honor, under Rule 12(d), the

8  Court can consider the expert report and convert the motion to

9  dismiss to a motion for summary judgment.

10          THE COURT:  But you didn't say that, did you?  You

11  didn't say, I want the matter converted to summary judgment.

12  Because I suspect you don't.  But I can't consider the expert

13  report unless I do that.  Am I correct?

14          MR. BULLWINKEL:  Yes, Your Honor.

15          THE COURT:  All right.  Thank you.  You've answered

16  that question.

17          Let me ask you further, assuming, just assuming,

18  arguendo, that the patent would fail Alice step one, why does

19  Figure 2AA of the '755 patent alone or in combination, with

20  the *Wainer* reference, not suffice to show that the claimed

21  improvement was obvious, and, therefore, not inventive under

22  Alice step two?

23          MR. BULLWINKEL:  Your Honor, with regards to step

24  two, the question is whether the claims are directed to an

25  inventive concept and whether they were well-known or

—Monarch Networking v. Juniper Networks—

41

1    conventional.  And that question is a question of fact.

2              Regarding Figure 2, the issue is to look at the

3    claims.  It's not Figure 2 that is under consideration here.

4    Instead, it is the claims of the patents themselves, and they

5    must be -- the elements of the claims must be considered and

6    the claims as a whole must be considered.

7              And these claims in the '775 patent are patent

8    eligible and they recite an inventive concept because they

9    recite a specific pseudowire configuration.  And the details

10   of that configuration are recited within the claim.  It

11   includes two pseudowires that are connected in a certain way,

12   and those pseudowires are comprised of specific links.  It is

13   this claimed configuration that provided an improvement over

14   the prior art.  And the patent says as much.  At Column 3,

15   lines 4 through 5, it explains that this solution has never

16   been envisaged in the prior art.

17             Turning to *Wainer*, Juniper has essentially raised a

18   disputed fact question through its reliance on *Wainer*.  It

19   relies on *Wainer* to show what was conventional in the art,

20   which is a question of fact, that must be proven by clear and

21   convincing evidence.  Juniper simply says, in its brief, "The

22   *Wainer* prior art reference also shows that sharing connections

23   to save bandwidth is conventional in computer networks."

24             To support this conclusion made by Juniper, they

25   cite a single sentence from *Wainer*, which says --

Monarch Networking v. Juniper Networks

42

1        THE COURT:  In the interest of time, can I see if --
2   I think I understand what you're saying, but let me see if I
3   can encapsulate it.

4        I asked you whether Figure 2AA of the patent in
5   combination with *Wainer* suffices to show that the claim didn't
6   prove that it was obvious.  Your answer is that involves a
7   factual question that can't be resolved on a 12(b)(6) motion,
8   is that correct?

9        MR. BULLWINKEL:  That's correct, Your Honor.

10        THE COURT:  All right.  Now, tell me was there an
11   Alice challenge to the '755 patent in the Monarch 1 case?

12        MR. BULLWINKEL:  There was at the summary judgment
13   stage, Your Honor.  That motion was pending when the case was
14   resolved.

15        THE COURT:  And how was the case resolved?

16        MR. BULLWINKEL:  The parties agreed to walk away.
17   It was settled, Your Honor.

18        THE COURT:  Well, I encourage settlement and I
19   encourage you all to settle as well at any point, but when the
20   parties disagree about whether a patent is valid and then
21   agree to settle the case, it raises the question, that I'm
22   sure you're familiar with, parties cannot agree to enforce an
23   invalid patent.  There's a Supreme Court opinion on that.

24        Of course, that doesn't mean that just because
25   they've agreed to settle the case, they've agreed to enforce

─────────Monarch Networking v. Juniper Networks─────────

43

1    an invalid patent, but it raises that issue.

2          All right.  Let me ask a final question of you, and

3    then I'll turn to opposing counsel.

4          As I understand it, the '775 patent describes

5    sending material, data in that instance, in a single vessel, a

6    pseudowire, part of the way before separating out to multiple

7    vessels for the final leg of the delivery.

8          How is this not taking an abstract and well-known

9    idea and simply applying it in the context of packet switching

10   networks?

11         MR. BULLWINKEL:  Your Honor, the claims are directed

12   to pseudowire networks.  The specification itself teaches that

13   pseudowires were recognized as an improvement to network

14   technology.  And that's described at Column 1, lines 43

15   through 49.  So pseudowires themselves were an improvement to

16   network technology.

17         The '775 patent invention further improves upon

18   these pseudowires with the specific configuration that it

19   recites, and, therefore, the '775 patent claims are a further

20   improvement to network technology.  And the complaint and the

21   specification both support this.

22         At paragraph 26 in the complaint, it says, "This

23   solution improves the operation of the network itself by

24   making more efficient use of the network's resources."  The

25   specification supports this assertion at Column 3, lines 1

44

1    through 2.  It says, "This optimizes the use of network

2    resources, for example, bandwidth."

3              And finally, the complaint also alleges that the

4    '775 patent claims improve network equipment.  Again, at

5    paragraph 26, it says, "This solution also improves the

6    functioning of the equipment that makes up the network."  This

7    is supported by the specification as well, Column 3, lines 44

8    through 45, "The solution proposed in the present application

9    makes the network equipment more responsive."

10             Your Honor, taking these allegations as true and

11   viewing them in the light most favorable to Monarch, this

12   shows that the '775 patent claims are directed to an

13   improvement in network technology.  And under the Federal

14   Circuit cases such as *DDR* or *Packet Intelligence*, claims that

15   are an improvement to the computer technology or claims that

16   are an improvement to network technology, at that point they

17   are deemed not to be directed to an abstract idea and the

18   inquiry, the Alice inquiry, stops at step one.

19             And that's the case we have here, Your Honor.  These

20   claims --

21             THE COURT:  All right.  Go ahead.  I'm sorry.

22             MR. BULLWINKEL:  These claims are directed to an

23   improvement in network technology.

24             THE COURT:  Thank you.  Mr. Briggs.

25             MR. BRIGGS:  Your Honor, could I hand up to you a

45

1  demonstrative that has Claim 1 of the '775 patent on it?

2         THE COURT:  You can but I don't know that it would

3  be appropriate.

4         What I want you to do is respond to his response to

5  my question.

6         MR. BRIGGS:  Right.  And I was going to use this

7  demonstrative in responding to his question.

8         THE COURT:  All right.  Has the other side seen a

9  copy of this?

10        MR. BRIGGS:  They haven't seen this demonstrative,

11 but it's simply Claim 1 of the '775 patent.  So they've seen

12 that before.

13        THE COURT:  All right.  Show it to Mr. Bullwinkel.

14        Do you have a problem with their using that?  If you

15 do, I'm not going to let him use it.

16        MR. BULLWINKEL:  No, Your Honor.

17        THE COURT:  All right.  Go ahead.  Let's do it

18 quickly.

19        MR. BRIGGS:  Sure, Your Honor.  If you turn to the

20 last page, which is page 4.

21        THE COURT:  Yes.

22        MR. BRIGGS:  It has '775 patent, Claim 1.  That's

23 the patent that we were just discussing.

24        THE COURT:  Yes.

25        MR. BRIGGS:  The only thing in this claim that's

Monarch Networking v. Juniper Networks

46

1  alleged to be new is the very last portion that's underlined

2  and placed in bold where it says, "Said first link being

3  shared by the first and second pseudowires."  Everything else

4  in that claim is conceded to be in the prior art and

5  conventional.

6           So this claim, the only possible portion of it that

7  could be inventive is that very last part that's underlined

8  and bold.  And all it says is, "Said first link being shared

9  by the first and second pseudowires."  That's it.  Sharing the

10  link.  That's the only thing they claim to be inventive.

11          But as everybody in the room knows, sharing a

12  resource, like a link here, that concept has been known since

13  the beginning of time.  I mean, stagecoaches traveling across

14  the country, you would put multiple things on one stagecoach

15  instead of running two stagecoaches across the country.  The

16  mail delivery example in our papers.  When you build a house

17  and you want to put multiple faucets in the house, you don't

18  run multiple lines from the main on the street into your

19  house, you run one main line up and then branch it off.  You

20  share that one resource.

21          This concept of a shared resource is well-known in

22  the prior art and it is not inventive.  And when you asked

23  counsel for Monarch, you know, how this -- how this is

24  inventive, what's the technological leap here with this

25  sharing of resources, he pointed you to the specification.

─────Monarch Networking v. Juniper Networks─────

47

1    And he said that the specification teaches that by sharing a

2    link it's -- it's more efficient.  Well, isn't -- isn't, you

3    know, using a single pipe coming from the street more

4    efficient than multiple pipes?  Isn't using a mail truck to

5    route mail to an intermediate facility and then branching it

6    off, isn't that more efficient?  It's the same.

7            So in our view, just very succinctly, there is

8    nothing inventive in this very broad patent claim.

9            THE COURT:  All right.  Do you have anything else to

10   say by way of his answers to my questions?  Because we're

11   about done.  I'm going to give you -- each of you -- about

12   five minutes to tell me anything else you want to tell me on

13   the motions to dismiss, but I must tell you I think the

14   briefing is very thorough.

15           MR. BRIGGS:  I have nothing further, Your Honor.

16   Thank you very much.

17           THE COURT:  All right.  And Mr. Briggs -- or, no,

18   not Mr. Briggs.  Mr. Bullwinkel.

19           MR. BULLWINKEL:  Thank you, Your Honor.  Just a

20   couple of points to follow up.

21           Juniper has admittedly focused on the last two lines

22   of Claim 1 in arriving at its purported abstract idea to which

23   the claims are directed.  And the Federal Circuit has

24   cautioned against this.  It specifically said in *Enfish*,

25   "Describing the claims at such a high level of abstraction and

─────Monarch Networking v. Juniper Networks─────

48

1   untethered from the plain language, the language of the claims

2   all but ensures that the exception to 101 swallows the rule."

3           Additionally, regarding the elements that may have

4   been known in the art versus elements that were not known in

5   the art, *Bascom* says specifically, "An inventive concept can

6   be found in the nonconventional and nongeneric arrangement of

7   known conventional pieces."

8           The specification itself says that this arrangement

9   was not known in the prior art.  These claims are directed to

10  pseudowire networks and a specific pseudowire network

11  configuration, and the patent itself teaches that this is an

12  improvement to network technology.  We don't even need to read

13  -- reach step two, Your Honor.

14          Thank you.

15          THE COURT:  Thank you.  All right.  I said I will

16  give you each five minutes more, but I truly don't think it's

17  necessary given the thoroughness of your briefs on both sides.

18  But I will adhere to what I said.

19          You're the movant, Mr. Briggs, do you have anything

20  else you want to emphasize to me that is not in the briefs or

21  already in the briefs?

22          MR. BRIGGS:  No, Your Honor.

23          THE COURT:  Thank you.  Good answer.

24          Mr. Bullwinkel, what's your response?

25          MR. BULLWINKEL:  I'd like to make one brief point as

Monarch Networking v. Juniper Networks

49

1    to the '844 patent, if I may.

2         THE COURT:  Yes, of course.  Do so.

3         MR. BULLWINKEL:  And I would like to hand up a

4    demonstrative.

5         THE COURT:  You may do so.

6         Go ahead, sir.

7         MR. BULLWINKEL:  At the end of the day, Juniper

8    asked the Court to resolve the following question on a

9    12(b)(6) motion.  Can a port set ID satisfy the claim to

10   destination port?  And we've explained in our briefing why

11   this is inappropriate at this stage of the case because of

12   claim construction issues that it raises.  It raises issues of

13   infringement which are a question of fact.

14        I just wanted to make one further point.  And that's

15   illustrated by this diagram.  If you look at the top -- so

16   Claim 1 of the '844 patent is directed to receiving an IPv4

17   packet, and it does some processing, and at the end of the day

18   out comes an IPv6 packet.  And that's what's being depicted

19   here.  At the top you have the IPv4 packet coming in.  That

20   packet includes an IPv4 header, a TCP, UDP header and then

21   some packet data.  And on the other end you get a IPv6 packet.

22   At the beginning you see the IPv6 address constructed, as

23   recited in the claims, it includes an operator prefix, an IPv4

24   address, and a PSID, the Port Set Identifier.

25        And I just want to focus on that Port Set Identifier

─────────── Monarch Networking v. Juniper Networks ───────────

50

1   because Juniper is focused on this A destination port number

2   versus the B destination port number, and Monarch throughout

3   has maintained that the port set ID satisfies the claimed

4   destination port number.

5           I just wanted to point out for the Court that the

6   PSID value is literally included within the IPv4 packet in the

7   TCP, UDP header section and it's also included in the IPv6

8   packet.  So even accepting Juniper's requirements of the exact

9   same bit stream, which Monarch does not agree with, that is

10  still satisfied.

11          That's all, Your Honor, unless you have further

12  questions.

13          THE COURT:  All right.  With this new demonstrative,

14  I'll give you a very brief opportunity, Mr. Briggs, to say

15  anything else you want to say given what he's argued.

16          MR. BRIGGS:  Thank you, Your Honor.

17          Again, this is all in the briefing, so I'm going to

18  keep this very simple.

19          The point here of this motion to dismiss on the '844

20  patent is that we're not asking the Court to engage in any

21  claim construction.  It's not necessary.  You know, we're not

22  asking the Court to look outside of the four corners of the

23  complaint.  That's not necessary.

24          We're assuming that all facts alleged in the

25  complaint are true.  But when you do that, Monarch has failed

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────

EASTERN DISTRICT OF VIRGINIA

51

1    to make out a facial case of infringement.  We have -- in

2    Claim 1 of the '844 patent, it states in the preamble, "A

3    destination port number."  And if you want to look at the

4    claim, Your Honor, this is on page 2 of the demonstratives

5    that I handed up initially, and we have underlined it.  It's

6    "A destination port number."

7            Then in the first -- first element of the claim, it

8    starts with constructing, it ends with "the destination port

9    number."  There's --

10            THE COURT:  Why isn't, though, this argument that

11    you're making depend on claim construction and then the

12    factual determination as to whether -- once the claim is

13    construed, the factual question of whether there's evidence of

14    infringement, none of which can be decided on the motion to

15    dismiss.

16            MR. BRIGGS:  Well, Your Honor, if you apply on a

17    motion to dismiss just the basic law of antecedent basis, then

18    their allegations fail.  So we don't need to get into the

19    issue of claim construction.  This is a simple antecedent

20    basis issue.

21            They need to identify the same infringing aspect of

22    the products for the destination port number as a destination

23    port number.  It's the same thing in the claim.  But they

24    don't do that in their -- in their complaint.  They point to

25    two different things.

─────Monarch Networking v. Juniper Networks─────

52

1          So for example, if the claim recited, you know, a

2  leg on a chair and then refers back to the leg on a chair,

3  well, here in the first instance, they would point to a leg on

4  a chair, and then in the second instance, they would point to

5  something else on the chair.

6          So they're not pointing to the same thing for the

7  same exact claim limitation, so there's no need to engage in

8  claim construction or anything of that nature.  That's our

9  position.

10          THE COURT:  All right.  Thank you.

11          MR. BRIGGS:  You're welcome.

12          THE COURT:  And I want to thank counsel for your

13  arguments.  They've been very helpful.  And I see a lot of

14  briefs, and many are disappointing.  Yours were not.  You've

15  done a good job, both sides.  Your briefs are thorough, and I

16  appreciate that, because I see many that are neither thorough

17  nor relevant in all instances.  So I thank you for that.

18          I'll take the matter under advisement.  I'm going to

19  decide it fairly promptly because we need to either send the

20  case elsewhere or get busy litigating this case.  Motions to

21  transfer should be decided promptly on the best evidence that

22  a district judge has and we've talked a lot about witnesses

23  and what witnesses know.

24          You all have tried many cases, and I'm sure that

25  your impressions about what witnesses may say and what they

─────Monarch Networking v. Juniper Networks─────

53

1    actually end up saying are not always the same.  We do the

2    best we can with the information we have available.  And you

3    all have done that for me from each of your perspectives, and

4    I appreciate that.

5            I'll resolve the motion to transfer promptly.  If I

6    don't transfer, we will move ahead with alacrity to discovery

7    and claim construction.  And if I do transfer it, it's

8    somebody else's headache.

9            It used to be -- I don't know why I bore you with

10   this -- but many years ago into the late '80s, early '90s,

11   late '80s would be better, for some reason patent lawyers

12   found it necessary -- not necessary -- attractive to file

13   suits here.  We didn't have many patent cases before that.

14   And all of a sudden we had an abundance, a plethora of patent

15   cases.  We had to decide what to do with them.

16           They were all filed in the northern division, the

17   Alexandria division.  We couldn't possibly do all of it,

18   because patent cases are typically labor intensive.  You have

19   to engage the technology in order to decide many issues in

20   patent cases.

21           So we decided -- we, the district judges, there were

22   only four of us, three of us at the time doing it, maybe four

23   -- and we decided that we would transfer cases arbitrarily to

24   the Richmond and Norfolk divisions.  Newport News didn't exist

25   at that time.  And so, parties would file in Alexandria only

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Monarch Networking v. Juniper Networks

54

1  to learn that they had to get in the car and drive 200 miles

2  to Norfolk.  It wasn't good.  But we had to do it and that had

3  a desired consequence.  Guess what?  Patent filings dropped

4  precipitously.  And that was important.

5        For years after that, I lobbied my colleagues to

6  stop doing that.  Always without success.  And I don't think

7  we do it anymore.  But I thought it was amusing to remember

8  that.  I do a lot of reminiscing now, looking ahead isn't

9  probable.

10        And I thank you for your arguments.  They were

11  informed and helpful.  And I appreciate that.  I hear too many

12  arguments that are neither well-informed, nor relevant, nor

13  worth listening to.  I think there was a time when many fewer

14  cases were done and fewer briefs filed.

15        I remember being a student in England going to

16  arguments -- there were no briefs, everything was oral -- and

17  lawyers would argue something, and then the judges and the

18  lawyers would get up, go over and pull out a book and read the

19  case.  Think about it.  Because Shepard's didn't exist, but

20  you all probably don't even remember Shepard's, and no

21  encyclopedias or anything else.  Everything turned on a

22  barrister's recollection of what were in the book -- what was

23  in the books.

24        Well, we've come a long way since then and my

25  friends in the UK don't appreciate having been infected by the

─Monarch Networking v. Juniper Networks─

55

1   American way of trying cases, discovery and briefs and all

2   that sort of thing.  They are still of the school -- you all

3   don't remember this, but a judge of this court, who is no

4   longer with us and hasn't been with us for a long time, when I

5   first came on the bench, he said, Well, Tim, he said, there

6   are two kinds of cases.  This is just to illustrate the

7   attitude that existed in the old way.  He said, "There are two

8   kinds of cases, there are no-brainers and there are real

9   no-brainers."

10          That's not true.  This is not a no-brainer.  This

11  requires effort.  But you all have helped a lot and I do

12  appreciate that.

13          Court stands in recess until 1:00.  And if you're

14  interested in what the PTAB does these days, you should stick

15  around for that.  This is a fascinating case.

16          Court stands in recess.  Thank you.

17

18          **(Proceedings adjourned at 12:36 p.m.)**

19

20

21

22

23

24

25

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

1                    CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motion

7    hearing in the case of the **MONARCH NETWORKING SOLUTIONS,**

8    **LLC versus JUNIPER NETWORKS, INC.**, Civil Action No.:

9    1:23-cv-670, in said court on the 15th day of September,

10   2023.

11          I further certify that the foregoing 56 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16          In witness whereof, I have hereto subscribed my

17   name, this September 21, 2023.

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              56